1

2

3                    UNITED STATES DISTRICT COURT
                    WESTERN DISTRICT OF WASHINGTON
4                              AT SEATTLE

5   L.B. and M.B., individually and on
    behalf of their minor child A.B.;
6   C.M. and A.H., individually and on
    behalf of their minor child J.M.; and
7   on behalf of others similarly situated,
                                                    C23-0953 TSZ
8                    Plaintiffs,
                                                    ORDER
9        v.

10  PREMERA BLUE CROSS,

11                   Defendant.

12          In this matter, plaintiffs have sued defendant Premera Blue Cross ("Premera") for

13  violating Section 1557 of the Affordable Care Act[1] [hereinafter "ACA § 1557"], which

14  states, in relevant part, that

15          an individual shall not, on the ground prohibited under . . . title IX of the
            Education Amendments of 1972 [("Title IX")] . . . [or] the Age
16          Discrimination Act of 1975 . . . , be excluded from participation in, be denied
            the benefits of, or be subjected to discrimination under, any health program
17          or activity, any part of which is receiving Federal financial assistance . . . .

18  42 U.S.C. § 18116(a). Premera's medical policy bars insurance coverage for procedures

19  known as mastectomy, breast reduction, or chest or top surgery that are performed on

20

21  _____

22  [1] The Affordable Care Act is a shortened name for the statute known as the Patient Protection
    and Affordable Care Act of 2010, Pub. L. No. 111-148.

23

ORDER - 1

1    "[f]emale to male patients" or "[f]emale to non-binary/gender neutral patients" who are

2    under "18 years of age."  *See* Premera Blue Cross Medical Policy – 7.01.557 (Sept. 1,

3    2022), Ex. B to Hamburger Decl. (docket no. 46-2); *see also* Premera Blue Cross Medical

4    Policy – 7.01.557 (Mar. 1, 2024), Ex. LL to Hamburger Decl. (docket no. 46-37).

5    Plaintiffs allege that Premera's categorical exclusion of mastectomies for transgender[2]

6    youth constitutes discrimination on the basis of sex and age in violation of Title IX and

7    the Age Discrimination Act ("AgeDA"), respectively, which are incorporated by

8    reference in ACA § 1557.  Now before the Court are plaintiffs' motion for partial

9    summary judgment with respect to their claim of facial discrimination on the basis of sex,

10   docket no. 43, Premera's cross-motion for summary judgment as to all claims, docket

11   no. 79, plaintiffs' motion for class certification, docket no. 38, and motions brought by

12   both sides to exclude the opposing side's expert witnesses, docket nos. 103, 104, 105,

13   106, 112, 115, 117, 119, 121, 123, and 125.

14        Having reviewed all papers filed in support of, and in opposition to, the pending

15   motions, the Court CONCLUDES that Premera's Medical Policy – 7.01.557 violates

16   ACA § 1557 by facially discriminating on the basis of sex, and GRANTS summary

17   judgment in favor of plaintiffs, entitling them to declaratory relief.  The Court further

18

19   _____

20   [2] "Gender identity" is a term generally used to describe a person's sense of being male, female,
     neither, or some combination of both.  *See* *Hecox v. Little*, 104 F.4th 1061, 1068 (9th Cir. 2024).

21   A transgender individual has a gender identity that does not correspond to the person's natal sex
     or sex assigned at birth, which is usually based on external genitalia that might or might not align

22   with other sex-related characteristics, including chromosomes and internal reproductive organs.
     *Id.* at 1068–69.

23

CONCLUDES that plaintiffs failed to administratively exhaust their age discrimination claims, and GRANTS in part and DENIES in part Premera's cross-motion for summary judgment.  Plaintiffs' ACA § 1557 claims that were required to comply with the exhaustion requirements of the AgeDA are DISMISSED with prejudice.  Plaintiffs' motion for class certification is DENIED, and the motions concerning expert testimony are moot in part and otherwise DEFERRED.  The Court's reasoning is set forth in the following Order.

**Background**

**A.      A.B. / AWB "HealthChoice" Plan**

Plaintiffs L.B. and M.B. are the parents of A.B., who was fifteen years old at the time this action commenced, and who is now seventeen.  _See_ Compl. at ¶ 3 (docket no. 1); _see_ Ex. 36 to Payton Decl. (docket no. 83-4) (indicating A.B.'s date of birth). A.B. identifies as male, and the pronouns "he," "him," and "his" will be used when referring to A.B.  A.B. has health insurance offered through his father's employer, which is a member of the Association of Washington Business ("AWB") and eligible to participate in the AWB "HealthChoice" health plan.  _See_ 2d Am. Compl. at ¶ 4 (docket no. 34); _see also_ Ex. 3 to Payton Decl. (docket no. 81-1); Ex. A to Hamburger Decl. (docket no. 46-1).

According to the HealthChoice benefit booklet, Premera is an independent licensee of the Blue Cross Blue Shield Association.  Ex. 3 to Payton Decl. (docket no. 81-1 at 104); Ex. A to Hamburger Decl. (docket no. 46-1 at 3).  Premera has contracted with AWB, referenced in the benefit booklet as "the Association Group," to

1  administer the HealthChoice plan, *i.e.*, "to use its expertise and judgment as part of the

2  routine operation of the plan to reasonably apply the terms of the contract for making

3  decisions as they apply to specific eligibility, benefits and claims situations."  Ex. 3 to

4  Payton Decl. (docket no. 81-1 at 104 & 184).  AWB is responsible "for collecting and

5  paying all subscription charges, receiving notice of additions and changes to employee

6  and dependent eligibility and providing such notice to" Premera.  *Id.* (docket no. 81-1 at

7  184).  Premera describes its role as a third-party administrator of a self-funded plan

8  governed by the Employee Retirement Income Security Act of 1974 ("ERISA").  *See*

9  Answer at ¶¶ 72–73, 127, & 141 (docket no. 35).  Premera asserts that it does not receive

10 federal financial assistance in connection with its role as the third-party administrator for

11 the HealthChoice plan.  *See* Def.'s Cross-Mot. & Resp. at 37–39 (docket no. 80).

12         HealthChoice benefits are available only when the service or supply at issue meets

13 the following requirements:  (i) it is furnished in connection with the prevention or

14 diagnosis and treatment of a covered illness, disease, or injury; (ii) it is medically

15 necessary; (iii) it is not excluded from coverage; (iv) the expense was incurred during a

16 covered period; (v) it is furnished by a "provider," who is performing services within the

17 scope of his or her license or certification; and (vi) it *meets the standards set forth in*

18 *Premera's medical and payment policies*.  Ex. 3 to Payton Decl. (docket no. 81-1 at 127)

19 (emphasis added); Ex. A to Hamburger Decl. (docket no. 46-1 at 5) (emphasis added).

20 The applicable medical policy is discussed in Section C, below.

21 / / /

22 / / /

23

ORDER - 4

**B.**    **J.M. / Premera Blue Cross Preferred Bronze Plan**

Plaintiffs C.M. and A.H. are the parents of J.M., who was seventeen years of age when the operative pleading was filed on June 4, 2024, but has since turned eighteen. _See_ 2d Am. Compl. at ¶ 5 (docket no. 34); _see also_ Ex. 61 to Payton Decl. (docket no. 83-5) (indicating J.M.'s date of birth).  J.M. identifies as male, and the pronouns "he," "him," and "his" will be used when referring to J.M.  Unlike A.B., who has health care insurance for which Premera serves as the third-party administrator, J.M. has a health plan offered by Premera itself, known as the "Preferred Bronze Plan," which his parents purchased through Washington Healthplanfinder.™  _See_ 2d Am. Compl. at ¶ 6 (docket no. 34).  Washington Healthplanfinder was created after the Affordable Care Act was enacted; it serves as a portal for enrolling in a health plan (_i.e._, an agreement between an individual and an insurance company), and it offers savings on premiums for people who meet certain income and other criteria.  _See_ https://www.wahealthplanfinder.org/us/en/ about-us/our-organization/about-us.html; https://www.wahealthplanfinder.org/us/en/ health-coverage/get-started/coverage-basics.html.  Premera concedes that it receives federal financial assistance in connection with J.M.'s family's health plan.  _See_ Def.'s Cross-Mot. & Resp. at 37 n.20 (docket no. 80).

The benefit booklet for J.M.'s family's health plan describes "covered services" as "medically necessary services" and "specified preventive care services."  _See_ Ex. J to Hamburger Decl. (docket no. 46-10 at 3).  The plan provides benefits for covered services only if all the following requirements are met:  (i) the reason for the service is to prevent, diagnose, or treat a covered illness, disease, or injury; (ii) the service occurs in a

1    medically necessary setting; (iii) the service is not excluded; and (iv) the provider is

2    working within the scope of his or her license or certification.  *See id.*; *see also* Ex. 2 to

3    Payton Decl. (docket no. 81-1 at 46).  With regard to gender-affirming care, the benefits

4    booklet for J.M.'s family's health plan indicates that surgical services that "meet the

5    criteria of the Premera *medical policy*" are covered.  Ex. J to Hamburger Decl. (docket

6    no. 46-10 at 4) (emphasis added); Ex. 2 to Payton Decl. (docket no. 81-1 at 51) (emphasis

7    added).  The applicable medical policy is discussed in the next section.

8    **C.    Medical Policy for Gender-Affirming Surgery**

9         Unlike the particular health care insurance contracts at issue, *i.e.* A.B.'s family's

10   "HealthChoice" plan or J.M.'s family's "Preferred Bronze" plan, which outline the terms

11   and conditions governing the specific insurance relationship, Premera's medical policies

12   apply when Premera makes coverage decisions, regardless of which health care plan is

13   involved or whether Premera serves as a third-party administrator or an insurer.  *See*

14   Small Dep. at 35:24–36:6, Ex. C to Hamburger Decl. (docket no. 46-3) ("Q. Why does

15   Premera have medical policies?  A. . . . The purpose of medical policies [is] to establish

16   medical necessity criteria for services that are covered services.  Q. And these policies

17   define when a service can be covered . . . as medically necessary or not; is that right?

18   A. That's correct.").  In this matter, the applicable medical policy, Premera Medical

19   Policy – 7.01.557, which took effect on September 1, 2022, states that, "[e]xcept when

20   otherwise stated in member contract language, mastectomy or breast reduction . . . [is]

21   considered medically necessary" for "female to male patients" or "female to non-

22   binary/gender neutral patients" when certain criteria are met, including that the individual

23

has a diagnosis of gender dysphoria and is "18 years of age or older."  _See_ Ex. B to

Hamburger Decl. (docket no. 46-2 at 4–5).  A different medical policy, which defines

gynecomastia as "swelling of breast tissue in _boys or men_," indicates that "[m]astectomy

surgery for gynecomastia may be considered medically necessary for non-malignant (not

cancer[ous]) indications for adults and _adolescents_" when the enumerated criteria are

satisfied.  _See_ Premera Medical Policy – 7.01.521, Ex. E to Hamburger Decl. (docket

no. 46-5) (emphasis added).

      In other words, pursuant to Premera's medical policies, even if all other medical

criteria are satisfied, mastectomies are _not_ considered medically necessary for "female to

male" or "female to non-binary/gender neutral" (_i.e._, transgender) patients under the age

of eighteen, but might be deemed medically necessary for cisgender male adolescents.

Premera has attempted to justify its policy categorically deeming gender-affirming breast

reductions medically unnecessary before the age of eighteen as premised on (i) a minor's

insufficient maturity "to make a truly informed, educated decision" and "to understand

all of the ramifications of such transformation including its irreversibility," and (ii) a lack

of flawless studies supporting gender-affirming surgeries for adolescents.  _See_ Premera

Blue Cross Medical Policy – 7.01.557, Ex. LL to Hamburger Decl. (docket no. 46-37 at

38–42).

      Notwithstanding its medical policy, Premera has granted 28 of the 63 requests it

has received for coverage of gender-affirming chest surgery for individuals under the age

of eighteen.  _See_ Hamburger Decl. at ¶ 16 (docket no. 46); _see also_ Ex. HH to Hamburger

Decl. (docket no. 46-33).  Of Premera's 28 prior authorizations, 22 resulted from the

1  application of a list of unwritten or secret exceptions developed by Premera's internal

2  reviewer Robert H. Small, M.D.  _See_ Hamburger Decl. at ¶ 16 (docket no. 46); _see also_

3  Small Dep. at 133:24–136:15, Ex. C to Hamburger Decl. (docket no. 46-3).  These

4  exceptions include (i) the minor is breast or chest "binding," causing rib or skeletal

5  injury, respiratory compromise, significant skin wounds, or pain, (ii) the minor is

6  experiencing suicidal ideation, self-harm behaviors, or severe functional impairment as a

7  result of "breast-induced gender dysphoria," and/or (iii) the minor has severe

8  gynecomastia that renders "binding" or hiding of the breasts infeasible.  _See_ Small Dep.

9  at 147:16–148:8, Ex. C to Hamburger Decl. (docket no. 46-3).  Premera has not

10  explained why it could not incorporate some or all of these (and/or perhaps other) criteria

11  into its medical policy rather than employing a blanket exclusion, which has secret

12  exceptions, and Premera's conduct in internally approving roughly thirty-five percent

13  (35%) of all requests for coverage completely undermines its assertion that the

14  insufficient maturity of minors and/or a dearth of scientifically-sound studies support (or

15  are the true reasons underlying) its policy deeming mastectomies or breast reductions for

16  transgender youth medically unnecessary.

17  **Discussion**

18  **A.**    **Standard for Summary Judgment**

19        The Court shall grant summary judgment if no genuine dispute of material fact

20  exists and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P.

21  56(a).  The moving party bears the initial burden of demonstrating the absence of a

22  genuine issue of material fact.  _Celotex Corp. v. Catrett_, 477 U.S. 317, 323 (1986).  A

23

1  fact is material if it "might affect the outcome of the suit under the governing law."

2  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  To survive a motion for

3  summary judgment, the adverse party must present affirmative evidence, which "is to be

4  believed" and from which all "justifiable inferences" are to be favorably drawn.  *Id.* at

5  255, 257.  When the record, however, taken as a whole, could not lead a rational trier of

6  fact to find for the non-moving party, summary judgment is warranted.  *See Matsushita*

7  *Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

8  **B.    Discrimination on the Basis of Sex**

9      ACA § 1557 incorporates the "enforcement mechanisms" of Title IX.  *See* 42

10  U.S.C. § 18116(a).  Title IX provides that, with certain exceptions not relevant in this

11  matter, "[n]o person in the United States shall, *on the basis of sex*, be excluded from

12  participation in, be denied the benefits of, or be subjected to discrimination under

13  any education program or activity receiving Federal financial assistance."  Pub. L.

14  No. 92-318, § 901(a), 86 Stat. 235, 373 (1972) (emphasis added) (codified as 20 U.S.C.

15  § 1681(a)).  Title IX does not expressly authorize a private right of action by a person

16  injured by a violation of § 901 (§ 1681), but the Supreme Court has held that such person

17  has an implied right of action under Title IX, which includes a right to monetary damages

18  as a remedy.  *See Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60 (1992); *Cannon v.*

19  *Univ. of Chicago*, 441 U.S. 677 (1979).

20      **1.    Standards Relating to Facial Discrimination**

21      Courts recognize two different types of intentional discrimination (also known as

22  disparate treatment):  (i) facial discrimination; and (ii) non-facial discrimination.  *See*

23

*Caldrone v. Circle K Stores, Inc.*, No. EDCV 21-749, 2023 WL 5505014, at *8 n.10 (C.D. Cal. Aug. 8, 2023).  Both forms of disparate treatment involve discrimination based on an immutable characteristic like sex.  Plaintiffs allege that Premera's medical policy is facially discriminatory in violation of Title IX, or in other words, that it "explicitly differentiates and discriminates" on the basis of sex.  *See id.*  Whether a policy or practice "involves disparate treatment through explicit facial discrimination does not depend on why the [defendant] discriminates but rather on the explicit terms of the discrimination." *UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 199 (1991); *see also Latta v. Otter*, 771 F.3d 456, 467–68 (9th Cir. 2014); *Lange v. Houston Cnty.*, 608 F. Supp. 3d 1340, 1357 (M.D. Ga. 2022) ("the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with discriminatory effect" (quoting *Johnson Controls*, 499 U.S. at 199)).

     In the context of Title VII of the Civil Rights Act of 1964 ("Title VII"), a facially discriminatory employment practice can survive a challenge if "religion, sex, or national origin is a bona fide occupational qualification ["BFOQ"] reasonably necessary to the normal operation of [the] particular business or enterprise."  42 U.S.C. § 2000e-2(e). Similarly, facially differential treatment might withstand scrutiny under the Fair Housing Act, 42 U.S.C. §§ 3601–3619, if the defendant shows either (i) "the restriction benefits the protected class," or (ii) the restriction "responds to legitimate safety concerns raised by the individuals affected, rather than being based on stereotypes."  *See Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1050 & n.4 (9th Cir. 2007); *see also* 42 U.S.C. §§ 3604(f)(9), 3607(a), & 3607(b)(1).  In this matter, Premera asserts that it may justify

facial discrimination in a manner similar to Title VII's BFOQ defense and/or the explicit

or implied exceptions to the Fair Housing Act, but it does not cite any statutory language

or judicial opinion; rather, Premera relies on a portion of a regulation that was adopted by

the Department of Health and Human Services ("HHS") in 2016, enjoined in 2016,

repealed in 2020, reinstated in part by district courts, re-enacted in a different form in

2024, and then stayed nationwide.[3]  Premera has not explained how it may invoke a

regulation that has never gone into effect as a result of the nationwide stay and is not

enforceable by the promulgating agency.

The regulation at issue provides in relevant part as follows:

(b) A covered entity must not, in providing or administering health insurance
coverage or other health-related coverage:

. . .

(3) Deny or limit coverage, deny or limit coverage of a claim, or impose
additional cost sharing or other limitations or restrictions on coverage, to

---

[3] _Nondiscrimination in Health Programs and Activities_, 81 Fed. Reg. 31375, 2016 WL 2866668
(May 18, 2016); _Nondiscrimination in Health and Health Education Programs or Activities,
Delegation of Authority_, 85 Fed. Reg. 37160, 2020 WL 3298450 (June 19, 2020) (repealing
45 C.F.R. § 92.207); _Nondiscrimination in Health Programs and Activities_, 89 Fed. Reg. 37522,
2024 WL 1962239 (May 6, 2024) [hereinafter "the May 2024 Rule"]; _see Tennessee v. Becerra_,
739 F. Supp. 3d 467 (S.D. Miss. 2024) (staying "the effective date of the May 2024 Rule"
and enjoining its enforcement and implementation nationwide); _see also Florida v. Dep't of Health &
Hum. Servs._, 739 F. Supp. 3d 1091 (M.D. Fla. 2024) (staying portions of the May 2024 Rule
within only Florida), _appeal filed_, No. 24-12826 (11th Cir. Aug. 30, 2024); _Texas v. Becerra_,
739 F. Supp. 3d 522, _amended by_ 2024 WL 4490621 (E.D. Tex. Aug. 30, 2024) (staying the
portions of the May 2024 Rule that were challenged, including 45 C.F.R. §§ 92.207(b)(3)–(5));
_Franciscan All., Inc. v. Burwell_, 553 F. Supp. 3d 361, 378 (N.D. Tex. 2021) (permanently
enjoining HHS and others from "interpreting or enforcing Section 1557 of the Affordable Care
Act . . . in a manner that would require [health plans, insurers, or third-party administrators] . . .
[to] provide insurance coverage for gender-transition procedures"), _aff'd in relevant part_, _sub
nom. Franciscan All., Inc. v. Becerra_, 47 F.4th 368 (5th Cir. 2022); _Whitman-Walker Clinic, Inc.
v. U.S. Dep't of Health & Hum. Servs._, 485 F. Supp. 3d 1 (D.D.C. 2020) (enjoining HHS from
repealing the 2016 regulation's definition of discrimination on the basis of sex); _Walker v. Azar_,
480 F. Supp. 3d 417 (E.D.N.Y. 2020) (same).

an individual based upon the individual's sex assigned at birth, gender identity, or gender otherwise recorded;

(4) Have or implement a categorical coverage exclusion or limitation for all health services related to gender transition or other gender-affirming care;

(5) Otherwise deny or limit coverage, deny or limit coverage of a claim, or impose additional cost sharing or other limitations or restrictions on coverage, for specific health services related to gender transition or other gender-affirming care if such denial, limitation, or restriction results in discrimination on the basis of sex;

. . . .

(c) *Nothing in this section requires coverage of any health service where the covered entity has a legitimate, nondiscriminatory reason for denying or limiting coverage of the health service or determining that such health service fails to meet applicable coverage requirements, including reasonable medical management techniques such as medical necessity requirements. Such coverage denial or limitation must not be based on unlawful animus or bias, or constitute a pretext for discrimination*. . . .

45 C.F.R. § 92.207 (emphasis added).  Premera relies on the highlighted portion of the stayed regulation, and it ignores the other provisions that prohibit the categorical exclusion or limitation of coverage for "gender transition or other gender-affirming care." Contrary to Premera's suggestion, given the context of the language at issue, it cannot be interpreted as creating a safe harbor for health insurance policies that facially discriminate with respect to "gender transition or other gender-affirming care" because the aim of the regulation as a whole is to prevent such discrimination.  *See id.* Moreover, even if the highlighted provision were construed as providing a "legitimate, nondiscriminatory reason" or "medical necessity" defense,[4] such defense would not, by

---

[4] The defense on which Premera wishes to rely is not the same as the second prong (*i.e.*, whether a legitimate, nondiscriminatory reason for the challenged action has been articulated) of the familiar three-part burden-shifting protocol first articulated in *McDonnell Douglas Corp. v.*

1    its own terms, apply to coverage denials or limitations that are based on "unlawful

2    animus or bias" or constitute a "pretext for discrimination."  *See id.* at § 92.207(c).  In

3    other words, in the context of a claim brought under ACA § 1557, a "legitimate,

4    nondiscriminatory reason" cannot be used to justify *facial* discrimination on the basis of a

5    protected trait like "sex."  Thus, the Court need not further consider Premera's contention

6    that some "legitimate, nondiscriminatory reason" or assertion of "medical necessity" can

7    insulate it from liability under ACA § 1557.[5]  Rather, the dispositive inquiries for the

8

_____

9    *Green*, 411 U.S. 792 (1973).  The *McDonnell Douglas* standard does not apply to facial
10   discrimination claims because "[t]he fact to be uncovered by such a protocol—whether the
     [defendant] made . . . [a] decision on a proscribed basis . . .—is not in dispute."  *See Bates v.*
11   *United Parcel Serv., Inc.*, 511 F.3d 974, 988 (9th Cir. 2007); *see also Cmty. House*, 490 F.3d at
     1049 (holding that "[t]he *McDonnell Douglas* test is inapplicable to Fair Housing Act challenges
12   to a facially discriminatory policy").

13   [5] In support of its motion for summary judgment, Premera provided reports from seven different
     experts, each opining that A.B.'s "bilateral mastectomy with free nipple grafting," which was
14   performed on June 28, 2023, was not medically necessary.  *See* Report of Michael K. Laidlaw,
     M.D. at ¶¶ 18, 171, & 180, Ex. 13 to Payton Decl. (docket no. 83-2 at 210, 245, & 247); *see also*
15   Reports of Sasha Ayad, Joseph Burgo, Ph.D., Erica Anderson, Ph.D., Stephen Levine, M.D.,
     Julia Mason, M.D., and Steven Montante, M.D., Exs. 8, 9, 10, 11, 12, & 14 to Payton Decl.
16   (docket no. 83-2).  Premera also submitted supplemental reports from three of these experts
     setting forth their views that a double mastectomy was not medically necessary for J.M.  *See*
17   Anderson Supp. Report, Ex. 50 to Payton Decl. (docket no. 83-5); Montante Supp. Report,
     Ex. 66 to Payton Decl. (docket no. 83-5); Mason Supp. Report, Ex. 80 to Payton Decl. (docket
18   no. 83-6).  Drs. Anderson's, Montante's, and Mason's opinions that gender-affirming surgery
     was not medically necessary for J.M. are contradicted by Premera's decision, announced the
19   week before J.M.'s eighteenth birthday, to provide coverage for a mastectomy.  *See* Ex. 9 to
     Hamburger Decl. (docket no. 100-9); Ex. 61 to Payton Decl. (docket no. 83-5) (indicating J.M.'s
20   date of birth).  Plaintiffs have moved to exclude the testimony of Premera's experts, none of
     whom evaluated or treated either A.B. or J.M, on the grounds that the experts lack the requisite
21   qualifications and/or their opinions do not meet the standards of admissibility.  *See* Pls.' Mots.
     (docket nos. 112, 115, 117, 119, 121, 123, & 125).  Because, as a matter of law, Premera may
22   not invoke medical necessity as a justification for facial discrimination in violation of ACA
     § 1557, the Court need not, at this stage of the proceedings, further consider Premera's experts'
     opinions.  Thus, plaintiffs' motions to exclude their testimonies are moot with respect to
     dispositive motion practice and will be addressed, if necessary, in later proceedings.  Similarly,

23

1  Court involve (i) how "sex" is defined for purposes of Title IX and ACA § 1557, and

2  (ii) whether Premera's medical policy facially discriminates "on the basis of sex."  *See* 20

3  U.S.C. § 1681(a).

4          **2.**     **Definition of "Sex" Under Title IX and ACA § 1557**

5         Courts have reached conflicting conclusions concerning how "sex" should be

6  defined.  On one side, courts have ascribed to the word "sex" the following meaning:  "a

7  person's biological sex—'an immutable characteristic determined solely by the accident

8  of birth.'"  *Texas*, 739 F. Supp. 3d at 533 (citing *Frontiero v. Richardson*, 411 U.S. 677,

9  686 (1973) (plurality opinion)[6]); *see also* *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th

10  791, 812 (11th Cir. 2022) (en banc); *Tennessee v. Cardona*, 737 F. Supp. 3d 510, 530

11  (E.D. Ky. 2024) (defining "sex" as "the character of being either male or female"); *Texas*

12  *v. Cardona*, 743 F. Supp. 3d 824, 871 (N.D. Tex. 2024) (indicating that, in 1972, when

13

14  ───────────────

15  Premera's motions, docket nos. 103–106, to exclude plaintiffs' experts Christine Brady, Ph.D., Dan Karasic, M.D., Johanna Olson-Kennedy, M.D., and Loren Schechter, M.D., are moot with

16  respect to dispositive motion practice and will be addressed, if necessary, in the future.  In seeking partial summary judgment concerning their sex discrimination claim under ACA § 1557, plaintiffs have not relied on their experts' opinions, *see* Pls.' Resp. & Reply at 8 (docket no. 128-

17  1), and the Court has not considered them in making its rulings.

18  [6] *Frontiero* concerned "the right of a female member of the uniformed services to claim her spouse as a 'dependent' for purposes of obtaining increased quarters allowances and medical and

19  dental benefits" in the same manner as a male member of the uniformed services.  411 U.S. at 678.  The plurality in *Frontiero* observed that "sex, like race and national origin, is an immutable

20  characteristic determined solely by the accident of birth."  *Id.* at 686.  It did so solely for the purpose of deciding what level of scrutiny to apply in determining whether the statutes at issue

21  violated the Due Process Clause of the Fifth Amendment by requiring a female member of the uniformed services to prove the dependency of her husband.  *See id.* at 686–91 (concluding that

22  "strict judicial scrutiny" applied and that the challenged statutes were unconstitutional).  The plurality's statement was not made with the intent of defining "sex."

23

ORDER - 14

1    Title IX was enacted, "'sex' carried an unambiguously binary meaning"), _appeal filed_,

2    No. 24-10910 (5th Cir. Oct. 7, 2024); _Neese v. Becerra_, 640 F. Supp. 3d 668, 678 n.6

3    (N.D. Tex. 2022) (observing that, in 1972, "'sex' was commonly understood to refer to

4    physiological differences between men and women – particularly with respect to

5    reproductive functions"), _vacated_, 123 F.4th 751 (5th Cir. 2024), _reh'g denied_, 127 F.4th

6    601 (5th Cir. 2025).

7         On the other side, courts have concluded that discrimination on the basis of sexual

8    orientation or transgender status constitutes discrimination on the basis of sex.  _See_

9    _Bostock v. Clayton Cnty._, 590 U.S. 644, 651–52 (2020) ("An employer who fires an

10   individual for being homosexual or transgender fires that person for traits or actions it

11   would not have questioned in members of a different sex.  Sex plays a necessary and

12   undisguisable role in the decision, exactly what Title VII forbids."); _see also_ _Kadel v._

13   _Fowell_, 100 F.4th 122, 164 (4th Cir. 2024) (concluding that, "even if the definition of sex

14   under Title IX encompasses only binary sex," the holding of _Bostock_ extends to ACA

15   § 1557, which therefore prohibits discrimination on the basis of gender identity), _petitions_

16   _for cert. filed_, Nos. 24-90 & 24-99 (July 25 & 26, 2024); _Grabowski v. Ariz. Bd. of_

17   _Regents_, 69 F.4th 1110, 1116–18 (9th Cir. 2023) (holding that "discrimination on the

18   basis of sexual orientation is a form of sex-based discrimination under Title IX," and that

19   "discrimination on the basis of _perceived_ sexual orientation is actionable under Title IX"

20   (emphasis added)); _Doe v. Snyder_, 28 F.4th 103, 114 (9th Cir. 2022) (rejecting the district

21   court's conclusion that _Bostock_ is limited to Title VII claims, reasoning that Title IX's

22   protections are construed consistently with those of Title VII, that the "because of sex"

23

1   language in Title VII is similar to the "on the basis of sex" wording of Title IX,[7] and that

2   the _Bostock_ Court used the two statutory phrases interchangeably in concluding that

3   firing a person based on sexual orientation or transgender status is discrimination

4   "because of sex"); _Dekker v. Weida_, 679 F. Supp. 3d 1271, 1289–90 (N.D. Fla. 2023)

5   ("If one must know the sex of a person to know whether or how a provision applies to the

6   person, the provision draws a line based on sex."), _appeal filed_, No. 23-12155 (11th Cir.

7   June 26, 2023); _C.P. v. Blue Cross Blue Shield of Ill._, No. 20-cv-6145, 2022 WL

8   17788148, at *6 (W.D. Wash. Dec. 19, 2022) ("Section 1557 forbids sex discrimination

9   based on transgender status." (citing _Doe_, 28 F.4th at 114)).

10          **3.    Blanket Bans on Gender-Affirming Surgeries**

11          The Court need not choose between the divergent interpretations of the term "sex"

12   because, under either view, Premera's medical policy facially discriminates on the basis

13   of sex.  The Fourth Circuit has held that healthcare plans covering treatments for certain

14   diagnoses but barring coverage of those same treatments for diagnoses unique to

---

[7] Notwithstanding its decisions in _Grabowski_ and _Doe_, the Ninth Circuit recently indicated that, although "[o]ther circuits have disagreed over whether Title IX's use of the word 'sex' unambiguously refers to sex assigned at birth," the Ninth Circuit has "never addressed this question directly, and we need not reach it here."  _See_ _Roe ex rel. Roe v. Critchfield_, 131 F.4th 975, 991 (9th Cir. 2025) (affirming the denial of a preliminary injunction as to a statute requiring "all public-school students in Idaho to use only the restroom and changing facility corresponding to their 'biological sex'").  _But see_ _Hecox v. Little_, 104 F.4th 1061, 1068 (9th Cir. 2024) (affirming an order preliminarily enjoining Idaho's Fairness in Women's Sports Act, which categorically bars transgender woman and girls from participating in or trying out for public school female sports teams at every level of competition), _petition for cert. filed_, No. 24-38 (July 11, 2024).

1  transgender patients discriminate "on the basis of sex," regardless of whether "sex"

2  means "biological sex" or "gender identity."  *See Kadel*, 100 F.4th at 133 & 143–54.

3        **a.**    **Narrow Definition of "Sex" ("Biological Sex")**

4       With respect to the "biological sex" or "sex assigned at birth" interpretation of the

5  term "sex," the Fourth Circuit explained as follows:

6      [Pursuant to the healthcare plans at issue, c]ertain gender-affirming surgeries
       that could be provided to people assigned male at birth and people assigned

7      female at birth are provided to only one group under the policy.  Those
       surgeries include vaginoplasty (for congenital absence of a vagina), breast

8      reconstruction (post-mastectomy), and breast reduction (for gynecomastia).
       Those assigned female at birth can receive vaginoplasty and breast

9      reconstruction for gender-affirming purposes, but those assigned male at
       birth cannot.  And those assigned male at birth can receive a mastectomy for

10     gender-affirming purposes, but those assigned female at birth cannot.  In
       other words, when the purpose of the surgery is to align a patient's gender

11     presentation with their sex assigned at birth, the surgery is covered.  When
       the purpose is to align a patient's gender presentation with a gender identity

12     that does not match their sex assigned at birth, the surgery is not covered.

13     This is textbook sex discrimination, for two reasons.  For one, we can
       determine whether some patients will be eliminated from candidacy for these

14     surgeries solely from knowing their sex assigned at birth.  And two,
       conditioning access to these surgeries based on a patient's sex assigned at

15     birth stems from gender stereotypes about how men or women should
       present.

16 *Id.* at 153 (citations omitted).  District courts in Alaska and Wisconsin have reached the

17 same conclusion using similar reasoning.  *See Fletcher v. Alaska*, 443 F. Supp. 3d 1024,

18 1030 (D. Alaska 2020) ("If plaintiff's natal sex were female and it was medically

19 necessary for her to have a vaginoplasty to correct a congenital defect, coverage would

20 have been available under AlaskaCare.  But, because plaintiff's natal sex is male and she

21 was seeking to transition to a female, coverage was not available.  Plainly, defendant

22

23

treated plaintiff differently in terms of health coverage because of her sex, irrespective of whether 'sex' includes gender identity."); _Boyden v. Conlin_, 341 F. Supp. 3d 979, 995–97 (W.D. Wis. 2018) ("[T]he Exclusion at issue here 'denies coverage for medically necessary surgical procedures based on a patient's natal sex.' . . .  Whether because of differential treatment based on natal sex, or because of a form of sex stereotyping where an individual is required effectively to maintain his or her natal sex characteristics, the Exclusion on its face treats transgender individuals differently on the basis of sex.").

_Kadel_, _Fletcher_, and _Boyden_ support ruling in plaintiffs' favor and granting summary judgment declaring Premera's medical policy in violation of ACA § 1557 because it facially discriminates "on the basis of sex."  As in those cases, in this matter, Premera's medical policy treats adolescents differently depending on whether their natal sex is male or female.  Pursuant to the "explicit terms," _see Johnson Controls_, 499 U.S. at 199, of Premera's medical policy, breast reductions performed for gender-affirming reasons are potentially available to males under the age of eighteen, but not to females under the age of eighteen.  _See_ Premera Medical Policy – 7.01.521, Ex. E to Hamburger Decl. (docket no. 46-5) (indicating that "[m]astectomy surgery for gynecomastia [swelling of breast tissue in boys or men] may be considered medically necessary for non-malignant (not cancer[ous]) indications for adults and _**adolescents**_" when the enumerated criteria are met (emphasis added)); Premera Medical Policy – 7.01.557, Ex. B to Hamburger Decl. (docket no. 46-2) (specifying that a mastectomy for a "[f]emale to male" or "[f]emale to non-binary/gender neutral" individual is _**not**_ medically

1    necessary if the person is not "18 years of age or older").  Premera's medical policy is

2    "textbook sex discrimination."  *See Kadel*, 100 F.4th at 153.

3              **b.    Broader Definition of "Sex" ("Gender Identity")**

4              Premera's medical policy also violates ACA § 1557 under the view that "sex" is

5    synonymous with "gender identity."  The *Kadel* Court began with the premise, developed

6    in an earlier decision, that gender identity is a protected characteristic.[8]  *See id.* at 143

7    (citing *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586 (4th Cir. 2020)).  The *Kadel*

8    Court then held that "gender dysphoria [is] a proxy for transgender identity," that "proxy

9    discrimination can be facial discrimination," and that, in the case before it, discrimination

10   on the basis of gender dysphoria constituted discrimination on the basis of gender

11   identity.  *Id.*  In reaching these conclusions, the Fourth Circuit noted that not all

12   transgender individuals are diagnosed with gender dysphoria and that not all people with

13   gender dysphoria seek gender-affirming surgery; however, "gender dysphoria is so

14   intimately related to transgender status as to be virtually indistinguishable from it."  *Id.* at

15   144 & 146; *see id.* at 146 ("In contrast to pregnancy—which is a condition that can be

16   ────────────────

17   [8] In a matter now pending before the Supreme Court, the Sixth Circuit reached the opposite
     conclusion, holding that transgender status is not a suspect class and that rational basis review
18   (rather than heightened or intermediate-level scrutiny) applies to equal protection claims
     challenging differential treatment of transgender individuals.  *See L.W. ex rel. Williams v.*
19   *Skrmetti*, 83 F.4th 460, 486–88 (6th Cir. 2023), *cert. granted* *sub nom.* *United States v. Skrmetti*,
     144 S. Ct. 2679 (2024).  The Supreme Court heard oral argument on December 4, 2024, and
20   Premera has asked the Court to stay this action pending the Supreme Court's decision in *L.W.*
     *L.W.* does not, however, involve any claim under ACA § 1557, and the outcome of the case is
21   unlikely to provide guidance that would affect the result of this matter.  Here, because plaintiffs
     do not present a constitutional tort claim or challenge any governmental action, the Court need
22   not decide what level of scrutiny applies with respect to distinctions made on the basis of gender
     identity and/or transgender status.  Thus, Premera's request for a stay is DENIED.

23

1  described entirely separately from a person's sex–gender dysphoria is simply the medical

2  term relied on to refer to the clinical distress that can result from transgender status.").

3      The Court agrees with the Fourth Circuit that gender dysphoria is a proxy for

4  transgender status.  Importantly, Premera's challenged medical policy requires as a

5  prerequisite for coverage of a mastectomy for "[f]emale to male" or "[f]emale to non-

6  binary/gender neutral" (*i.e.*, transgender) patients that they have a diagnosis of gender

7  dysphoria.  *See* Premera Medical Policy – 7.01.557, Ex. B to Hamburger Decl. (docket

8  no. 46-2).  No similar diagnosis is necessary when a cisgender boy seeks coverage of a

9  mastectomy.  *See* Premera Medical Policy – 7.01.521, Ex. E to Hamburger Decl. (docket

10 no. 46-5).  Thus, pursuant to the definition that equates gender identity and/or transgender

11 status with "sex," Premera's medical policy discriminates on the basis of sex by overtly

12 differentiating between transgender and cisgender youth or by using the proxy of gender

13 dysphoria.  *See C.P.*, 2022 WL 17788148, at *6; *see also Bostock*, 590 U.S. at 651–52;

14 *Kadel*, 100 F.4th at 164; *Doe*, 28 F.4th at 114; *cf. Hecox*, 104 F.4th at 1082 (observing

15 that, in a prior case, "sex was a valid proxy for average physiological differences between

16 men and women," but a "ban on transgender female athletes applies broadly to many

17 students who do *not* have athletic advantages over cisgender female athletes." (emphasis

18 in original)).

19          c.    **Conclusion**

20      Regardless of whether "sex" means "biological sex" or "gender identity,"

21 Premera's Medical Policy – 7.01.557 discriminates "on the basis of sex."  The medical

22 policy treats juveniles in disparate ways depending on whether their "biological sex" or

23

1  sex assigned at birth is male or female.  The medical policy also employs the proxy of

2  gender dysphoria to differentiate between adolescents on the basis of "gender identity"

3  and cisgender or transgender status.  Because the medical policy discriminates "on the

4  basis of sex," it violates ACA § 1557.

5      **4.    <u>Federal Financial Assistance</u>**

6      Plaintiffs assert (and Premera does not dispute) that Premera receives federal

7  financial assistance in its "Medicare[9] Advantage and [its] individual programs where

8  members may receive a subsidy for their premium," Akers Dep. at 15:4–22, Ex. H to

9  Hamburger Decl. (docket no. 46-8), as well as by participating in the Federal Employee

10  Program.  <u>See</u> Pls.' Mot. at 3 (docket no. 43) (also citing Akers Dep. at 16:4–21 (docket

11  no. 46-8)); <u>see also</u> Def.'s Cross-Mot. & Resp. at 37 n.20 (docket no. 80) ("Premera does

12  receive federal financial assistance tied to J.M.'s individual health plan.").  Premera

13  contends that ACA § 1557 "does not apply institution-wide to Premera but rather only

14  applies to Premera's specific programs or activities for which it receives federal financial

15  assistance."  Def.'s Cross-Mot. & Resp. at 38–39 (docket no. 80).  Premera does not,

16  however, suggest that it uses different medical policies for its assorted programs, for

17  example, one policy for its programs in which it receives federal financial assistance, and

18  another policy or policies for its other programs.  Thus, for purposes of deciding whether

19  the medical policy at issue violates ACA § 1557, the Court need not assess the extent to

20

21  _____

22  [9] Medicare is administered by the Centers for Medicare and Medicaid Services, which is an
    agency within HHS.  <u>See</u> https://www.cms.gov/about-cms/who-we-are/organizational-chart.

23

which Premera must comply with the statute across the various parts of its business; with

regard to an insurance contract concerning which Premera concedes it is governed by

ACA § 1557, namely the health plan issued to J.M.'s family, Premera's medical policy

fails to abide by the anti-discrimination mandate of the Affordable Care Act.[10]

To be clear, the Court is <u>not</u> ruling that gender-affirming surgeries for juveniles

must always be covered; rather, the Court is concluding only that a categorical ban (with

unwritten, secret exceptions) on such procedures for "female to male" or "female to non-

binary/gender neutral" adolescents runs afoul of ACA § 1557.  With regard to Premera's

current medical policy, plaintiffs' motion for partial summary judgment is GRANTED,

and the portion of Premera's cross-motion for summary judgment seeking dismissal of

plaintiffs' sex discrimination claim under ACA § 1557 is DENIED.

## C.    **Discrimination Based on Age**[11]

An age discrimination claim brought pursuant to ACA § 1557 is governed by the

Age Discrimination Act of 1975, Pub. L. No. 94-135.  <u>See</u> 42 U.S.C. § 18116(a).  Title III

---

[10] Importantly, Premera does not dispute that the health plan issued to J.M.'s family qualifies as a "health program or activity" within the meaning of ACA § 1557.  Premera, however, criticizes the reasoning of another judge in this District who concluded that a third-party administrator for a self-funded plan governed by ERISA was operating a "health program or activity" and was subject to ACA § 1557 because it received federal financial assistance for some of its other products, which were not at issue in the case.  <u>See</u> Def.'s Cross-Mot. & Resp. at 38 (docket no. 80) (disagreeing with <u>C.P.</u>, 2022 WL 17788148, at *5–6).  <u>C.P.</u> is distinguishable because, unlike in that matter, in this action, one of the health plans at issue is admittedly subsidized by federal financial assistance.  Moreover, to the extent that Premera contends the <u>C.P.</u> Court erred in construing "health program or activity" to include a health insurance contract, Premera has missed the very purpose of the Affordable Care Act.  <u>See</u> 42 U.S.C. §§ 18001–18122.

[11] Plaintiffs were provided an opportunity to move for summary judgment as to their claims of age discrimination in violation of ACA § 1557, but they opted not to do so, asserting that

1  of the AgeDA provides that, pursuant to regulations promulgated by the Secretary of

2  Health and Human Services, as well as any federal department or agency that extends

3  federal financial assistance to any program or activity, and with certain statutory

4  exceptions, "no person in the United States shall, on the basis of age, be excluded from

5  participation in, be denied the benefits of, or be subjected to discrimination under, any

6  program or activity receiving Federal financial assistance."  42 U.S.C. § 6102; *see also*

7  42 U.S.C. § 6103.  Unlike Title IX, the AgeDA explicitly authorizes private actions

8  against alleged violators, albeit for only injunctive relief and not for monetary damages.

9  *See* *Steshenko v. Gayrard*, 44 F. Supp. 3d 941, 951 (N.D. Cal. 2014).

10  **1.    Administrative Exhaustion**

11  The AgeDA requires that a plaintiff provide at least 30 days' notice[12] before filing

12  suit:

13  When any interested person brings an action in any United States district
   court for the district in which the defendant is found or transacts business
14  to enjoin a violation of this Act by any program or activity receiving Federal
   financial assistance, such interested person shall give notice by registered
15  mail not less than 30 days prior to the commencement of that action to the

16

17  _____

18  genuine disputes of material fact preclude judgment as a matter of law in favor of either side.
   *See* Pls.' Resp. & Reply at 5 & n.4 (docket no. 128-1).  Plaintiffs further represented that, if the
19  Court granted plaintiffs' motion for partial summary judgment with regard to their claim of facial
   discrimination on the basis of sex, the Court need not reach the merits of plaintiffs' age
   discrimination claims.  *See* *id.* at 2.  Premera, however, has brought a cross-motion for summary
20  judgment, and the Court must therefore consider whether the age discrimination claims should
   remain or be dismissed.

21  [12] The notice must state "the nature of the alleged violation, the relief to be requested, the court
   in which the action will be brought, and whether or not attorney's fees are being demanded in the
22  event that the plaintiff prevails."  42 U.S.C. § 6104(e)(2).

23

Secretary of Health and Human Services, the Attorney General of the United States, and the person against whom the action is directed.

42 U.S.C. § 6104(e)(1).  An AgeDA or ACA § 1557 plaintiff must also submit a

prelitigation claim to the Department of Health and Human Services:

Any person, individually or as a member of a class or on behalf of others, may file a complaint with HHS, alleging discrimination prohibited by the Act or these regulations based on an action occurring on or after July 1, 1979.  A complainant shall file a complaint within 180 days from the date the complainant first had knowledge of the alleged act of discrimination.  However, for good cause shown, HHS may extend this time limit.

45 C.F.R. § 91.42(a).  Administrative remedies are deemed exhausted if:

(1) 180 days have elapsed since the complainant filed the complaint and HHS has made no finding with regard to the complaint; or

(2) HHS issues any finding in favor of the recipient.

45 C.F.R. § 91.50(a); *see also* 42 U.S.C. § 6104(f).

### 2.  <u>**Failure to Exhaust**</u>

Plaintiffs did not satisfy all exhaustion requirements.  They did not provide notice

to the HHS Secretary or the Attorney General until January 13, 2025, which was over a

year and a half after this litigation commenced.  *See* Ex. 29 to Hamburger Decl. (docket

no. 100-28).  They also failed to file a complaint with HHS within 180 days after they

"first had knowledge of the alleged act of discrimination."  *See* 45 C.F.R. § 91.42(a);

*compare* Ex. F to 2d Am. Compl. (docket no. 34-6) (indicating that Premera denied

coverage for A.B.'s mastectomy and related reconstructive surgery on December 3, 2022)

*with* Hamburger Decl. at ¶ 5(25) & Ex. 25 (docket nos. 100 & 100-24) (reflecting that a

complaint was filed with HHS's Office of Civil Rights ("OCR") on behalf of A.B. and

his parents on February 27, 2024); *compare* Ex. L to 2d Am. Compl. (docket no. 34-12)

1    (showing that Premera denied coverage for J.M.'s mastectomy and related reconstructive

2    surgery on August 25, 2023) _with_ Hamburger Decl. at ¶ 5(26) & Ex. 26 (docket nos. 100

3    & 100-25) (establishing that a complaint was filed with HHS's OCR on behalf of J.M.

4    and his parents on March 11, 2024).  Finally, plaintiffs did not wait the requisite 180 days

5    after filing complaints with HHS before initiating or joining in this action.  _See_ Exs. 27 &

6    28 to Hamburger Decl. (docket nos. 100-26 & 100-27) (containing copies of letters dated

7    December 10, 2024, from HHS's OCR announcing its decision to "close" the matters

8    "without further investigation"); Compl. (docket no. 1) (filed June 27, 2023, on behalf of

9    A.B. and his parents); 2d Am. Compl. (docket no. 34) (filed June 4, 2024, joining J.M.

10    and his parents).

11        **3.    No Substantial Compliance**

12        Although the Court agrees with plaintiffs that administrative exhaustion is not a

13    jurisdictional requirement,[13] the Court cannot conclude that plaintiffs substantially

14

---

15    [13] Although two district courts within the Ninth Circuit have treated exhaustion as a jurisdictional

16    requirement, _see Jackson v. Argosy Univ._, No. 12-CV-2091, 2014 WL 309306, at *4 (D. Nev. Jan. 27, 2014); _Marin v. Eidgahy_, No. 10 CV 1906, 2011 WL 2446384, at *6 (S.D. Cal. June 17, 2011), the Sixth Circuit has more recently questioned this conclusion, _see Galuten v. Williamson_

17    _Cnty. Hosp. Dist._, No. 21-5007, 2021 WL 3043275, at *4 n.3 (6th Cir. July 20, 2021) ("It is questionable whether the ADA's exhaustion requirement provides the type of clear statement

18    necessary to make it 'jurisdictional' post-_Arbaugh_.  But because this issue would not alter our outcome, we need not resolve it today." (citations omitted)).  In the decision referenced by the

19    Sixth Circuit in _Galuten_, the Supreme Court held that the numerical threshold that it qualify as a "employer" for purposes of Title VII (_i.e._, having fifteen or more employees) was not

20    jurisdictional, but rather an "essential" or "substantive" ingredient of the federal claim for relief, and thus, it could not, like the lack of subject-matter jurisdiction, be raised at any time; the

21    alleged employer's failure to assert prior to the close of trial on the merits that it had fewer than fifteen employees constituted a waiver of the defense.  _See Arbaugh v. Y&H Corp._, 546 U.S. 500

22    (2006).  Post-_Arbaugh_, the Ninth Circuit has concluded that a failure to exhaust pre-filing remedies "deprives federal courts of subject matter jurisdiction _only_ in those cases in which

23

1    complied with the applicable regulatory and statutory provisions.  Indeed, plaintiffs did

2    not even come close to satisfying any of the prerequisites to suit.  Plaintiffs have asked

3    the Court to "waive" the exhaustion requirements, _see_ Pls.' Resp. & Reply at 33–34

4    (docket no. 128-1), but they have not provided any authority concerning the standards for

5    "waiver" or any discussion of whether such criteria have been met.  Plaintiffs' claims

6    under ACA § 1557 for age discrimination are DISMISSED for failure to exhaust.  _See_

7    _Grant v. Alperovich_, 703 F. App'x 556 (9th Cir. 2017) (affirming a dismissal for failure

8    to exhaust of a patient's AgeDA claim against her treating physician).

9         Each of the letters from HHS in which plaintiffs' respective administrative

10   proceedings were closed indicated that, if "a subsequent event . . . change[s] the

11   landscape with respect to the types of allegations in [the] complaint," a new complaint

12   could be filed and "OCR will waive the 180-day deadline for filing complaints in

13   appropriate cases."  Exs. 27 & 28 to Hamburger Decl. (docket nos. 100-26 & 100-27).

14   Plaintiffs suggest that the possibility of new regulations or judicial decisions, which

---

Congress makes plain the jurisdictional character of the exhaustion requirement in question."
_Maronyan v. Toyota Motor Sales, U.S.A., Inc._, 658 F.3d 1038, 1040 (9th Cir. 2011) (emphasis
added).  The Ninth Circuit has also held that the statute of limitations set forth in the Federal Tort
Claims Act is not jurisdictional and may be equitably tolled.  _Wong v. Beebe_, 732 F.3d 1030 (9th
Cir. 2013).  In _Wong_, the Ninth Circuit explained that, "[t]o ward off profligate use of the term
'jurisdiction,'" the Supreme Court has "adopted a 'readily administrable bright line' for
determining whether to classify a statutory limitation as jurisdictional."  _Id._ at 1036.  The
requisite inquiry is "whether Congress has 'clearly state[d]' that the rule is jurisdictional," and
in the absence of such clear statement, courts must "treat the restriction as nonjurisdictional in
character."  _Id._ (alteration in original).  In light of _Arbaugh_, subsequent Ninth Circuit decisions,
and the absence of the requisite "clear statement" in either ACA § 1557 or the AgeDA, the Court
concludes that exhaustion is not a jurisdictional prerequisite to suit under ACA § 1557 for age
discrimination.

ORDER - 26

1    might alter HHS's authority with respect to plaintiffs' age discrimination claims under

2    ACA § 1557, requires the dismissal of their claims be without prejudice.  Plaintiffs,

3    however, fail to demonstrate that they should be entitled to renew their exhaustion

4    efforts.  Monetary damages are not available under the AgeDA, and A.B.'s and J.M.'s

5    respective mastectomies (as well as J.M.'s reaching of adulthood) have left them with no

6    basis to seek an injunction.  Thus, plaintiffs can no longer state an age discrimination

7    claim for which relief may be granted.  Premera's motion for summary judgment is

8    GRANTED with respect to the ACA § 1557 claims of age discrimination, and those

9    claims are DISMISSED with prejudice.

10   **D.**   **Class Certification**

11          Rule 23 operates as "an exception to the usual rule that litigation is conducted by

12   and on behalf of the individual named parties only."  *Comcast Corp. v. Behrend*, 569

13   U.S. 27, 33 (2013) (quoting *Califano v. Yamasaki*, 442 U.S. 682, 700-01 (1979)).  To

14   maintain a class action, a plaintiff must "affirmatively demonstrate" compliance with

15   Rule 23.  *Id.* (citing *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)).  The

16   prerequisites of Rule 23 are not mere pleading standards, but rather are evidentiary

17   thresholds, *id.*, and before a class may be certified, a plaintiff must prove (1) the class is

18   so numerous that joinder of all members is impracticable; (2) questions of law or fact

19   common to the class exist; (3) the representative's claims are typical of the claims of the

20   class; and (4) the representative will "fairly and adequately" protect the interests of the

21   class.  Fed. R. Civ. P. 23(a).

22

23

ORDER - 27

A plaintiff must also present evidence to establish that the case falls within one of three permissible categories of class action.  _Behrend_, 569 U.S. at 34 (citing Fed. R. Civ. P. 23(b)).  In this matter, plaintiffs seek class certification under 23(b)(2).[14] Rule 23(b)(2) permits certification of a class if, with respect to a class that meets the criteria of Rule 23(a), the opposing party "has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate" with regard to the class "as a whole."  Fed. R. Civ. P. 23(b)(2).

Plaintiffs seek to certify the following class:

> All individuals who have been, are, or will be participants or beneficiaries in Premera health plans and/or health benefit plans (whether insured or administered by Premera) who required, require, or will require treatment with gender-affirming chest surgery to treat their diagnosis of gender dysphoria, and who were or will be denied pre-authorization or coverage of such surgery because they were or are under the age of 18.

Pls.' Mot. at 4 (docket no. 38 at 11) (citing 2d Am. Compl. at ¶ 115 (docket no. 34)). Plaintiffs propose a class period beginning on June 27, 2019, which is four (4) years

---

[14] Plaintiffs also assert that Rule 23(b)(1)(B) applies.  Rule 23(b) authorizes a class action if Rule 23(a) is satisfied and if "(1) prosecuting separate actions by . . . individual class members would create a risk of . . . (B) adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other [absent] members . . . or would substantially impair or impede their ability to protect their interests."  Fed. R. Civ. P. 23(b). Plaintiffs invoke Rule 23(b)(1)(B) because Premera's denials of gender-affirming surgeries for minors are categorical and discriminatory, but they do not explain how adjudication of one minor's claims would impair or impede the ability of other transgender juveniles to protect their interests or assert similar claims.  No assertion is (or could be) made that Premera has a limited pool of money for providing health care benefits.  And, if anything, even without the certification of a class, a ruling favorable to one or more plaintiffs would serve as collateral estoppel (issue preclusion) against Premera and would benefit absent individuals who are similarly situated to plaintiffs, while an unfavorable ruling would not bind anyone who is not a named plaintiff. Thus, the Court CONCLUDES that plaintiffs have not made the requisite showing for a Rule 23(b)(1)(B) class.

before this action was initiated,[15] and extending into the future.  *Id.*  Plaintiffs do not

propose any geographical limitation for a certified class, and they estimate that 75% of

Premera's enrollees are not in plans issued in Washington.  Pls.' Mot. at 11–12 (docket

no. 38 at 18–19).  Premera contends that plaintiffs' proposed class does not meet the

numerosity, commonality, typicality, and adequacy requirements of Rule 23(a), and that

plaintiffs cannot satisfy the criteria of Rule 23(b)(2).

The Court concludes that plaintiffs do not meet the typicality and adequacy criteria

for class certification.  "To establish typicality, as required by Rule 23(a)(3), plaintiffs

must show that 'the claims or defenses of the representative parties are typical of the

---

[15] Premera challenges plaintiffs' proposed class period, arguing that the applicable limitation period for claims under the Affordable Care Act is three (3) years.  Premera relies on district court decisions that have borrowed, for an ACA claim, the limitation period for an analogous state law claim.  *See* Def.'s Resp. at 12 (docket no. 82) (citing *Smith v. Highland Hosp. of Rochester*, No. 17-CV-6781, 2018 WL 4748187 (W.D.N.Y. Oct. 2, 2018) (applying the three-year limitation period for personal-injury claims, which applies to Title IX claims brought in federal court in New York, because the ACA incorporates the "enforcement mechanisms" of *inter alia* Title IX), *Solis v. Our Lady of the Lake Ascension Cmty. Hosp., Inc.*, No. 18-56, 2020 WL 2754917 (M.D. La. May 27, 2020) (borrowing a one-year limitation period, which applies to Rehabilitation Act claims brought in federal court in Louisiana), and *Ward v. Our Lady of the Lake Hosp., Inc.*, No. 18-454, 2020 WL 414457 (M.D. La. Jan. 24, 2020) (same)).  Other courts, however, have concluded that the four-year limitation period set forth in 28 U.S.C. § 1658(a) governs.  *Vega-Ruiz v. Northwell Health*, 992 F.3d 61 (2d Cir. 2021); *Doe v. Pennsylvania*, No. 19-CV-2193, 2021 WL 1212574 (M.D. Pa. Mar. 31, 2021); *Palacios v. MedStar Health, Inc.*, 298 F. Supp. 3d 87 (D.D.C. 2018).  This analysis is consistent with a Ninth Circuit decision involving a claim brought under a federal law other than the ACA that was also enacted after December 1, 1990.  *See McGreevey v. PHH Mortg. Corp.*, 897 F.3d 1037, 1041–42 (9th Cir. 2018) ("Traditionally, when a federal statute creating a right of action did not include a limitations period, courts would apply the limitations period of the 'closest state analogue.'. . . But in 1990, Congress established—in 28 U.S.C. § 1658(a)—a uniform, catchall limitations period for actions arising under federal statutes enacted after December 1, 1990. . . . If § 1658(a) applies, there is no need for a court to seek a state law analogue when analyzing a statute-of-limitations argument.").  Thus, plaintiffs' proposed class period, dating back four years before this lawsuit commenced, is appropriate.

claims or defenses of the class.'" *A.B. v. Haw. State Dep't of Educ.*, 30 F.4th 828, 839

(9th Cir. 2022) (quoting Fed. R. Civ. P. 23(a)(3)). "The test of typicality 'is whether

other members have the same or similar injury, whether the action is based on conduct

which is not unique to the named plaintiffs, and whether other class members have been

injured by the same course of conduct.'" *Id.* (quoting *Hanon v. Dataproducts Corp.*, 976

F.2d 497, 508 (9th Cir. 1992)). "Because the considerations underlying the two

requirements overlap considerably, the Supreme Court has noted that '[t]he commonality

and typicality requirements of Rule 23(a) tend to merge.'" *Id.* (quoting *Gen. Tel. Co. of*

*Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982)). The adequacy analysis requires the Court

to inquire (i) whether the putative class representatives and their counsel have any

conflicts of interest with other class members; and (ii) whether the named plaintiffs and

their attorneys will prosecute the action vigorously on behalf of the class. *See Kim v.*

*Allison*, 87 F.4th 994, 1000 (9th Cir. 2023).

Both A.B. and J.M. have already had gender-affirming chest surgery, J.M. has

turned eighteen, and J.M.'s mastectomy was approved by Premera during the week

*before* he aged out of the proposed class. *See* 2d Am. Compl. at ¶ 96 (docket no. 34);

Ex. 9 to Hamburger Decl. (docket no. 100-9); Ex. 61 to Payton Decl. (docket no. 83-5)

(indicating J.M.'s date of birth). J.M.'s claims are not typical of class members who are

under eighteen or of class members who were or will be denied pre-authorization while

still juveniles. Moreover, A.B.'s and J.M.'s claims are not typical of class members who

have not yet had surgery, and they are not adequate representatives with respect to the

pursuit of injunctive relief. Class certification is not required for purposes of effectuating

the declaratory relief that plaintiffs seek, and class certification is not sought with respect

to damages or other monetary relief.  The Court concludes that plaintiffs have not met the

requirements of Rule 23(a), and their motion for class certification is DENIED.

**<u>Conclusion</u>**

For the foregoing reasons, the Court ORDERS:

(1)    Plaintiffs' motion for partial summary judgment, docket no. 43, is

GRANTED; plaintiffs are entitled to a declaratory judgment that Premera's Medical

Policy – 7.01.557 violates ACA § 1557 by facially discriminating on the basis of sex;

(2)    Premera's cross-motion for summary judgment, docket no. 79, is

GRANTED in part and DENIED in part as follows:

(a)    Plaintiffs' claims under ACA § 1557 for age discrimination are

DISMISSED with prejudice for failure to exhaust;

(b)    Premera's cross-motion for summary judgment is otherwise

DENIED;

(3)    Plaintiffs' motion for class certification, docket no. 38, is DENIED;

(4)    The parties' respective motions to exclude experts, docket nos. 103, 104,

105, 106, 112, 115, 117, 119, 121, 123, and 125, are moot with respect to dispositive

motion practice and otherwise DEFERRED;

(5)    Counsel shall meet and confer and file a Joint Status Report within twenty-

one (21) days of the date of this Order, indicating (a) whether a trial will be necessary in

this matter, (b) what issues remain for trial, (c) whether the parties will be prepared to

1    proceed on the current trial date of September 15, 2025, and (d) how many days the

2    parties anticipate needing for trial in light of its reduced scope.

3          (6)    The Clerk is directed to send a copy of this Order to all counsel of record.

4    IT IS SO ORDERED.

5    Dated this 18th day of April, 2025.

6

7

8    Thomas S. Zilly
     United States District Judge

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

ORDER - 32