# APPENDIX 1

H.R. REP. 95-948, H.R. Rep. No. 948, 95TH Cong., 2ND Sess. 1978, 1978 U.S.C.C.A.N. 4749, 1978 WL 8570 (Leg.Hist.)

P.L. 95-555, CIVIL RIGHTS ACT OF 1964-- PREGNANCY DISCRIMINATION

SEE PAGE 92 STAT. 2076

SENATE REPORT (HUMAN RESOURCES COMMITTEE) NO. 95-331, JULY 6, 1977 (TO ACCOMPANY S. 995)

HOUSE REPORT (EDUCATION AND LABOR COMMITTEE) NO. 95-948, MAR. 13, 1978 (TO ACCOMPANY H.R. 6075)

HOUSE CONFERENCE REPORT NO. 95-1786, OCT. 13, 1978

(TO ACCOMPANY S. 995)

CONG. RECORD VOL. 123 (1977)

CONG. RECORD VOL. 124 (1978)

DATES OF CONSIDERATION AND PASSAGE

SENATE SEPTEMBER 16, 1977; OCTOBER 13, 1978

HOUSE JULY 18, OCTOBER 15, 1978

THE SENATE BILL WAS PASSED IN LIEU OF THE HOUSE BILL AFTER AMENDING ITS LANGUAGE TO CONTAIN MUCH OF THE TEXT OF THE HOUSE BILL. THE HOUSE REPORT (THIS PAGE) AND THE HOUSE CONFERENCE REPORT (P. 4765) ARE SET OUT.

(CONSULT NOTE FOLLOWING TEXT FOR INFORMATION ABOUT OMITTED MATERIAL. EACH COMMITTEE REPORT IS A SEPARATE DOCUMENT ON WESTLAW.)

HOUSE REPORT NO. 95-948

MAR. 13, 1978

**\*1  \*\*4749**  THE COMMITTEE ON EDUCATION AND LABOR TO WHOM WAS REFERRED THE BILL (H.R. 6075) TO AMEND TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 TO PROHIBIT SEX DISCRIMINATION ON THE BASIS OF PREGNANCY, HAVING CONSIDERED THE SAME, REPORT FAVORABLY THEREON WITH AN AMENDMENT AND RECOMMEND THAT THE BILL AS AMENDED DO PASS.

\* \* \* \*

SUMMARY

THE PURPOSE OF H.R. 6075 IS TO AMEND TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 BY ADDING TO SECTION 701 A NEW SUBSECTION (K) WHICH CLARIFIES THAT THE PROHIBITIONS AGAINST SEX DISCRIMINATION IN THE ACT INCLUDE DISCRIMINATION IN EMPLOYMENT BASED ON PREGNANCY, CHILD BIRTH OR RELATED MEDICAL CONDITIONS.

DURING FULL COMMITTEE CONSIDERATION, AN AMENDMENT WAS ADOPTED WHICH STATES THAT BENEFITS DO NOT HAVE TO BE PROVIDED FOR ABORTION EXCEPT WHERE NECESSARY TO PRESERVE THE LIFE OF THE MOTHER.

THE PROVISIONS OF THIS BILL TAKE EFFECT IMMEDIATELY UPON ENACTMENT, EXCEPT THAT, WITH REGARD TO FRINGE BENEFITS PLANS, THE EFFECTIVE DATE IS 180 DAYS AFTER ENACTMENT. FOR A PERIOD OF AT LEAST ONE YEAR, OR UNTIL THE **\*2** EXPIRATION OF ANY APPLICABLE COLLECTIVE BARGAINING AGREEMENT, EMPLOYERS MAY NOT REDUCE EXISTING BENEFITS AS A MEANS OF COMING INTO COMPLIANCE.  **\*\*4750**  HOWEVER, WHERE EMPLOYEES AND EMPLOYERS SHARE THE COST OF

PRESENTLY EXISTING BENEFITS, EMPLOYERS ARE PERMITTED TO APPORTION THE THE COST OF ANY BENEFIT REQUIRED AS A RESULT OF THIS LEGISLATION.

## BACKGROUND AND PURPOSE

CONGRESS ENACTED TITLE VII OF THE CIVIL RIGHTS ACT OF 1964, AS AMENDED BY THE EQUAL EMPLOYMENT OPPORTUNITY ACT OF 1972, TO PROHIBIT DISCRIMINATION IN EMPLOYMENT ON THE BASIS OF RACE, COLOR, RELIGION, SEX OR NATIONAL ORIGIN.

H.R. 6075 WILL AMEND TITLE VII TO CLARIFY CONGRESS' INTENT TO INCLUDE DISCRIMINATION BASED ON PREGNANCY, CHILDBIRTH OR RELATED MEDICAL CONDITIONS IN THE PROHIBITION AGAINST SEX DISCRIMINATION IN EMPLOYMENT.

THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, CHARGED WITH IMPLEMENTATION OF TITLE VII, INTERPRETED THE ACT TO INCLUDE DISCRIMINATION BASED ON PREGNANCY. THE EEOC GUIDELINES, AS AMENDED IN MARCH 1972, STATE THAT EXCLUDING APPLICANTS OR EMPLOYEES FROM EMPLOYMENT BECAUSE OF PREGNANCY OR RELATED MEDICAL CONDITIONS IS A VIOLATION OF TITLE VII. SPECIFICALLY, THESE GUIDELINES REQUIRE EMPLOYERS TO TREAT DISABILITIES CAUSED OR CONTRIBUTED TO BY PREGNANCY, MISCARRIAGE, ABORTION, CHILDBIRTH AND RECOVERY THEREFROM AS ALL OTHER TEMPORARY DISABILITIES. (SEE 29 C.F.R. 1604.10.) IT IS THE COMMITTEE'S VIEW THAT THESE GUIDELINES RIGHTLY IMPLEMENTED THE TITLE VII PROHIBITION OF SEX DISCRIMINATION IN THE 1964 ACT.

EIGHTEEN FEDERAL DISTRICT COURTS AND ALL SEVEN FEDERAL COURTS OF APPEALS WHICH HAVE CONSIDERED THE ISSUE HAVE RENDERED DECISIONS PROHIBITING DISCRIMINATION IN EMPLOYMENT BASED ON PREGNANCY, IN ACCORD WITH THE FEDERAL GUIDELINES.

CONTRARY TO THESE RULINGS AND GUIDELINES, THE SUPREME COURT, IN GENERAL ELECTRIC CO. V. GILBERT, 429 U.S. 125 (1976), [1] DECIDED IN FAVOR OF GENERAL ELECTRIC'S DISABILITY INSURANCE PLAN, WHICH EXCLUDED COVERAGE FOR WOMEN WITH PREGNANCY-RELATED DISABILITIES. THE COURT CONCLUDED THAT THIS EXCLUSION IN THE COMPANY'S BENEFITS POLICY WAS NOT GENDER-RELATED BUT CONDITION-RELATED. IT WENT ON TO INDICATE THAT BECAUSE THE PLAN DID NOT EXCLUDE ANY DISABILITY THAT COULD BE INCURRED BY BOTH MEN AND WOMEN, IT WAS NOT DISCRIMINATORY.

JUSTICE BRENNAN, IN A DISSENTING OPINION, SUPPORT THE EEOC GUIDELINES AS A REASONABLE INTERPRETATION AND IMPLEMENTATION OF THE BROAD SOCIAL OBJECTIVES OF TITLE VII. HE POINTED OUT THAT SINCE THE PLAN INCLUDED COMPREHENSIVE COVERAGE FOR MALES, AND FAILED TO PROVIDE COMPREHENSIVE COVERAGE FOR FEMALES, THE MAJORITY ERRED IN FINDING THAT THE EXCLUSION OF PREGNANCY DISABILITY COVERAGE WAS A NONDISCRIMINATORY POLICY. FURTHERMORE, JUSTICE STEVENS, IN HIS DISSENTING OPINION, ARGUED THAT 'IT IS THE CAPACITY TO BECOME PREGNANT WHICH PRIMARILY DIFFERENTIATES THE FEMALE FROM THE MALE.'

IT IS THE COMMITTEE'S VIEW THAT THE DISSENTING JUSTICES CORRECTLY INTERPRETED THE ACT.

ONCE THE COURT MAJORITY IN GILBERT CONCLUDED THAT DISCRIMINATION ON THE BASIS OF PREGNANCY WAS NOT SEX DISCRIMINATION ON ITS FACE, IT APPLIED A SECOND TEST FOR DISCRIMINATION UNDER TITLE VII: WHETHER THE **4751 *3 DISABILITY BENEFITS PROGRAM AT ISSUE HAD A DISPARATE IMPACT ON WOMEN. IN CONCLUDING THAT THERE WAS NO SUCH IMPACT, THE MAJORITY RELIED ON THE FACT THAT 'THERE IS NO PROOF THAT THE PACKAGE IS IN FACT WORTH MORE TO MEN THAN TO WOMEN.'

HOWEVER, IN A CASE DECIDED AFTER GILBERT, NASHVILLE GAS CO. V. SATTY, 54 L.ED.2D 356 (DEC. 6, 1977), THE SUPREME COURT HELD THAT A POLICY DEPRIVING WOMEN WHO ARE ABSENT FROM WORK BECAUSE OF CHILDBIRTH OF ACCUMULATED SENIORITY FOR CERTAIN PURPOSES DOES HAVE A DISPARATE IMPACT ON WOMEN, AND DOES VIOLATE TITLE VII. SATTY WAS DISTINGUISHED FROM GILBERT ON THE GROUND THAT ' . . . (THE EMPLOYER) HAS NOT MERELY REFUSED TO EXTEND TO WOMEN A BENEFIT THAT MEN CANNOT AND DO NOT RECEIVE, BUT HAS IMPOSED ON WOMEN A SUBSTANTIAL BURDEN THAT MEN NEED NOT SUFFER.' YET, WHILE THE SATTY COURT DENIED THAT 'THE DISTINCTION BETWEEN BENEFITS AND BURDENS IS . . . ONE OF SEMANTICS,' IT DID NOT EXPLAIN WHY THE 'BURDEN' APPROACH DID NOT APPLY IN GILBERT, WHERE ONLY WOMEN WERE BURDENED WITH PAYING THEIR LIVING EXPENSES OUT OF THEIR OWN SAVINGS DURING A DISABILITY PERIOD. NOR DID IT EXPLAIN WHY THE RIGHT TO RETAIN ONE'S SENIORITY WHILE ABSENT FROM WORK IS NOT A 'BENEFIT.' THUS, ALTHOUGH SATTY DID INDICATE THAT, IN SOME INSTANCES, POLICIES SINGLING OUT PREGNANCY AND CHILDBIRTH FOR SPECIAL TREATMENT CAN VIOLATE TITLE VII AS IT IS NOW, IT LEFT BOTH EMPLOYERS AND EMPLOYEES IN THE UNTENABLE POSITION OF GUESSING, WITHOUT ANY JUDICIAL GUIDANCE, WHETHER THE COURTS WOULD APPLY THE 'BENEFITS' OR THE 'BURDENS' LABEL TO A PARTICULAR POLICY.

H.R. 6075 WAS INTRODUCED TO CHANGE THE DEFINITION OF SEX DISCRIMINATION IN TITLE VII TO REFLECT THE COMMONSENSE VIEW AND TO ENSURE THAT WORKING WOMEN ARE PROTECTED AGAINST ALL FORMS OF EMPLOYMENT DISCRIMINATION BASED ON SEX. BY MAKING CLEAR THAT DISTINCTIONS BASED ON PREGNANCY ARE PER SE VIOLATIONS OF TITLE VII, THE BILL WOULD ELIMINATE THE NEED IN MOST INSTANCES TO RELY ON THE IMPACT APPROACH, AND THUS WOULD OBVIATE THE DIFFICULTIES IN APPLYING THE DISTINCTIONS CREATED IN SATTY.

THE VIEW OF NONDISCRIMINATION INCORPORATED IN H.R. 6075 IS SUPPORTED BY THE FACT THAT ALMOST HALF OF THE STATES PRESENTLY INTERPRET THEIR OWN FAIR EMPLOYMENT PRACTICES LAWS TO PROHIBIT SEX DISCRIMINATION BASED ON PREGNANCY AND CHILDBIRTH.

IN ENACTING TITLE VII, CONGRESS MANDATED EQUAL ACCESS TO EMPLOYMENT AND ITS CONCOMITANT BENEFITS FOR FEMALE AND MALE WORKERS. HOWEVER, THE SUPREME COURT'S NARROW INTERPRETATIONS OF TITLE VII TEND TO ERODE OUR NATIONAL POLICY OF NONDISCRIMINATION IN EMPLOYMENT. WE ARE LEFT IN A STATE OF NATIONAL CONFUSION AND WITH INCONSISTENT PRACTICES FROM STATE TO STATE.

AS TESTIMONY RECEIVED BY THIS COMMITTEE DEMONSTRATES, THE ASSUMPTION THAT WOMEN WILL BECOME PREGNANT AND LEAVE THE LABOR FORCE LEADS TO THE VIEW OF WOMEN AS MARGINAL WORKERS, AND IS AT THE ROOT OF THE DISCRIMINATORY PRACTICES WHICH KEEP WOMEN IN LOW-PAYING AND DEADEND JOBS. H.R. 6075 UNMISTAKABLY REAFFIRMS THAT SEX DISCRIMINATION INCLUDES DISCRIMINATION BASED ON PREGNANCY, AND SPECIFICALLY DEFINES STANDARDS WHICH REQUIRE THAT PREGNANT WORKERS BE TREATED THE SAME AS OTHER EMPLOYEES ON THE BASIS OF THEIR ABILITY OR INABILITY TO WORK.

WE RECOGNIZE THAT ENACTMENT OF H.R. 6075 WILL REFLECT NO NEW LEGISLATIVE MANDATE OF THE CONGRESS NOR EFFECT CHANGES IN PRACTICES, COSTS, OR BENEFITS BEYOND THOSE INTENDED BY TITLE VII OF THE CIVIL **4752 *4 RIGHTS ACT. ON THE CONTRARY, THE NARROW APPROACH UTILIZED BY THE BILL IS TO ERADICATE CONFUSION BY EXPRESSLY BROADENING THE DEFINITION OF SEX DISCRIMINATION IN TITLE VII TO INCLUDE PREGNANCY-BASED DISCRIMINATION. IF, HOWEVER, CONGRESS WERE NOT TO CLARIFY ITS ORIGINAL INTENT, AND THE SUPREME COURT'S INTERPRETATIONS

OF TITLE VII WERE ALLOWED TO STAND, CONGRESS WOULD YIELD TO AN INTOLERABLE POTENTIAL TREND IN EMPLOYMENT PRACTICES.

CHRONOLOGY OF THE BILL

H.R. 5055 WAS INTRODUCED ON MARCH 15, 1977, BY MR. HAWKINS AND COSPONSORED BY 81 MEMBERS. ON APRIL 5, 1977, THE BILL WAS AMENDED AND REINTRODUCED AS H.R. 6075. THIS LEGISLATION, WHICH WAS REFERRED TO THE COMMITTEE ON EDUCATION AND LABOR, CURRENTLY HAS 119 COSPONSORS. HEARINGS WERE HELD ON THE BILL BY THE SUBCOMMITTEE ON EMPLOYMENT OPPORTUNITIES ON APRIL 6 AND JUNE 29, 1977. ON FEBRUARY 2, 1978, THE SUBCOMMITTEE, BY VOICE VOTE, VOTED TO REPORT THE BILL WITH AMENDMENTS TO THE FULL COMMITTEE. ON MARCH 2, THE FULL COMMITTEE ON EDUCATION AND LABOR AMENDED THE BILL TO ADD A PROVISION EXEMPTING ABORTION FROM FRINGE BENEFIT COVERAGE EXCEPT WHERE THE LIFE OF THE MOTHER IS ENDANGERED, AND THEN VOTED 25 TO 6 TO REPORT THE BILL TO THE HOUSE WITH A RECOMMENDATION THAT IT PASS.

PROVISIONS OF THE BILL

1. THE BASIC PRINCIPLES

THIS LEGISLATION WOULD CLEARLY ESTABLISH THAT THE PROHIBITION AGAINST SEX DISCRIMINATION IN TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 INCLUDES A PROHIBITION AGAINST EMPLOYMENT-RELATED DISCRIMINATION ON THE BASIS OF PREGNANCY, CHILDBIRTH, OR RELATED MEDICAL CONDITIONS. AS AN AMENDMENT TO TITLE VII, THIS BILL WILL APPLY TO ALL ASPECTS OF EMPLOYMENT--HIRING, REINSTATEMENT, TERMINATION, DISABILITY BENEFITS, SICK LEAVE, MEDICAL BENEFITS, SENIORITY AND OTHER CONDITIONS OF EMPLOYMENT CURRENTLY COVERED BY TITLE VII. PREGNANCY-BASED DISTINCTIONS WILL BE SUBJECT TO THE SAME SCRUTINY ON THE SAME TERMS AS OTHER ACTS OF SEX DISCRIMINATION PROSCRIBED IN THE EXISTING STATUTE. THE COMMITTEE AMENDMENT TO THE BILL ALSO PROVIDES THAT UNDER ANY HEALTH OR TEMPORARY DISABILITY INSURANCE OR SICK LEAVE PLAN AVAILABLE IN CONNECTION WITH EMPLOYMENT, NEITHER PREGNANCY NOR RELATED MEDICAL CONDITIONS MAY BE CONSTRUED TO INCLUDE ABORTIONS EXCEPT WHERE THE LIFE OF THE MOTHER WOULD BE ENDANGERED IF THE FETUS WERE CARRIED TO TERM. HOWEVER, THIS SHALL NOT PRECLUDE AN EMPLOYER FROM PROVIDING ABORTION BENEFITS OR OTHERWISE AFFECT COLLECTIVE BARGANING AGREEMENTS IN REGARD TO ABORTIONS.

IT MUST BE EMPHASIZED THAT THIS LEGISLATION, OPERATING AS PART OF TITLE VII, PROHIBITS ONLY DISCRIMINATORY TREATMENT. THEREFORE, IT DOES NOT REQUIRE EMPLOYERS TO TREAT PREGNANT EMPLOYEES IN ANY PARTICULAR MANNER WITH RESPECT TO HIRING, PERMITTING THEM TO CONTINUE WORKING, PROVIDING SICK LEAVE, FURNISHING MEDICAL AND HOSPITAL BENEFITS, PROVIDING DISABILITY BENEFITS, OR ANY OTHER MATTER. H.R. 6075 IN NO WAY REQUIRES THE INSTITUTION OF ANY NEW PROGRAMS WHERE NONE CURRENTLY EXIST. THE BILL WOULD SIMPLY REQUIRE THAT PREGNANT WOMEN BE TREATED THE SAME AS OTHER EMPLOYEES ON THE BASIS OR THEIR ABILITY OR INABILITY TO WORK.

**4753 *5 THE 'SAME TREATMENT' MAY INCLUDE EMPLOYER PRACTICES OF TRANSFERRING WORKERS TO LIGHTER ASSIGNMENTS, REQUIRING EMPLOYEES TO BE EXAMINED BY COMPANY DOCTORS OR OTHER PRACTICES, SO LONG AS THE REQUIREMENTS AND BENEFITS ARE ADMINISTERED EQUALLY FOR ALL WORKERS IN TERMS OF THEIR ACTUAL ABILITY TO PERFORM WORK.

IN USING THE BROAD PHRASE 'WOMEN AFFECTED BY PREGNANCY, CHILDBIRTH AND RELATED MEDICAL CONDITIONS,' THE BILL MAKES CLEAR THAT ITS PROTECTION EXTENDS TO THE WHOLE RANGE OF MATTERS CONCERNING THE CHILDBEARING PROCESS. AT THE SAME TIME, THE BILL IN INTENDED TO BE LIMITED TO EFFECTS UPON THE WOMAN WHO IS HERSELF PREGNANT, BEARING A CHILD, OR HAS A RELATED MEDICAL CONDITION, AND NOT TO INCLUDE ANY EFFECT UPON ONE WOMAN DUE TO THE PREGNANCY OF ANOTHER.

### A. DISABILITY AND SICK LEAVE BENEFITS

THE SUPREME COURT HAS DEALT WITH THE EXCLUSION OF PREGNANCY OR PREGNANCY-RELATED MEDICAL CONDITIONS FROM AN EMPLOYER'S TEMPORARY DISABILITY BENEFITS PLAN AND FROM AN EMPLOYER'S SICK LEAVE PLAN. THE COURT IN GILBERT HELD THAT GENERAL ELECTRIC'S EXCLUSION OF PREGNANCY FROM A NONOCCUPATIONAL SICKNESS AND ACCIDENT INSURANCE PROGRAM DID NOT CONSTITUTE SEX DISCRIMINATION IN VIOLATION TO TITLE VII. THE COURT IN SATTY DENIED SICK LEAVE BENEFITS TO PREGNANT EMPLOYEES.

THIS BILL WOULD PREVENT EMPLOYERS FROM TREATING PREGNANCY, CHILDBIRTH AND RELATED MEDICAL CONDITIONS IN A MANNER DIFFERENT FROM THEIR TREATMENT OF OTHER DISABILITIES. IN OTHER WORDS, THIS BILL WOULD REQUIRE THAT WOMEN DISABLED DUE TO PREGNANCY, CHILDBIRTH OR OTHER RELATED MEDICAL CONDITIONS BE PROVIDED THE SAME BENEFITS AS THOSE PROVIDED OTHER DISABLED WORKERS. THIS WOULD INCLUDE TEMPORARY AND LONG-TERM DISABILITY INSURANCE, SICK LEAVE, AND OTHER FORMS OF EMPLOYEE BENEFIT PROGRAMS.

H.R. 6075 WILL NOT REQUIRE AN EMPLOYER WHO DOES NOT PROVIDE DISABILITY BENEFITS OR PAID SICK LEAVE TO OTHER EMPLOYEES TO PROVIDE THEM FOR PREGNANT WORKERS. IN ADDITION, THE BILL WOULD PERMIT EMPLOYERS WHO PROVIDE A VOLUNTARY UNPAID LEAVE POLICY TO CONTINUE TO DO SO, AS LONG AS THE PLAN IS NOT DISCRIMINATORY. IF AN EMPLOYER HAS A DISABILITY INSURANCE PLAN OR PAID SICK LEAVE POLICY, HE OR SHE WILL NOT BE ALLOWED TO REDUCE BENEFITS TO COMPLY WITH H.R. 6075. THE ONLY TIME THE EMPLOYER WILL BE REQUIRED TO ALLOW PREGNANT WORKERS TO USE THIS LEAVE IS DURING THE TIME THEY ARE MEDICALLY UNABLE TO WORK, DURING THE SAME PERIOD OF TIME AND UNDER THE SAME TERMS APPLICABLE TO OTHER EMPLOYEE. FOR EXAMPLE, IF A WOMAN WANTS TO STAY HOME TO TAKE CARE OF THE CHILD, NO BENEFIT MUST BE PAID BECAUSE THIS IS NOT A MEDICALLY DETERMINED CONDITION RELATED TO PREGNANCY. AND, IF AN EMPLOYER HAS A TEMPORARY DISABILITY PROGRAM WHICH PAYS UP TO 15 WEEKS (AS 90 PERCENT OF DISABILITY PLANS PROVIDE FOR 15 TO 26 WEEKS) THAT DOES NOT MEAN A PREGNANT WORKER CAN RECEIVE BENEFITS FOR ALL OF THOSE 15 WEEKS. SHE MAY ONLY RECEIVE BENEFITS FOR THOSE WEEKS DURING WHICH SHE IS MEDICALLY UNABLE TO WORK. TESTIMONY BEFORE THE COMMITTEE INDICATES THAT IN 95 PERCENT OF THE CASES, THE TIME LOST FROM WORK DUE TO PREGNANCY IS 6 WEEKS OR LESS, SO BARRING ANY MEDICAL COMPLICATIONS, THIS PERIOD WOULD BE THE NORMAL TIME A PREGNANT WOMAN WOULD BE COVERED. IF, HOWEVER, MEDICAL COMPLICATIONS AROSE, WHICH IS THE CASE IN ABOUT 5 PERCENT OF ALL PREGNANCIES, THESE COMPLICATIONS SHOULD BE COVERED BY THE SAME TIME LIMITS OR DOLLAR AMOUNTS OTHERWISE PROVIDED DISABLED WORKERS.

**\*\*4754 \*6** THERE HAS BEEN SOME CONCERN EXPRESSED THAT PROVIDING PREGNANCY-RELATED DISABILITIES WILL CREATE A SPECIAL POTENTIAL FOR ABUSE OR MALINGERING. HOWEVER, AS ONE DISTRICT COURT HAS OBSERVED, THERE IS 'NO BASIS FOR ASSIGNING THE TENDENCY TO MALINGER AS A SEX-RELATED CHARACTERISTIC.' LIBERTY MUTUAL V. WETZEL, 372 F.SUPP. 1146, 1164 (W.D. PA. 1974)

H.R. 6075 WOULD NOT PREVENT THE CONTROL OF POTENTIAL ABUSE IN DISABILITY BENEFITS PROGRAMS AS LONG AS THOSE CONTROLS WERE NOT DISCRIMINATORY. FOR EXAMPLE, MANY EMPLOYERS REQUIRE A PHYSICIAN'S CERTIFICATION OF AN EMPLOYEE'S INABILITY TO WORK. THIS WOULD BE ALLOWED UNDER H.R. 6075 AS LONG AS IT WAS REQUIRED OF ALL PERSONS APPLYING FOR DISABILITY OR SICK LEAVE BENEFITS. AN EMPLOYER COULD ALSO REQUIRE EXAMINATION BY A COMPANY PHYSICIAN TO CONFIRM THE MEDICAL DISABILITY. THIS, TOO, WOULD BE ALLOWED IF APPLIED TO ALL TYPES OF DISABILITIES. NO SPECIAL REQUIREMENTS CAN BE CREATED TO COVER PREGNANCY OR CHILDBIRTH ALONE.

### B. MEDICAL BENEFITS

THIS BILL WOULD REQUIRE EMPLOYERS WHO PROVIDE MEDICAL BENEFITS FOR THEIR EMPLOYEES TO COVER THE MEDICAL AND HOSPITAL COSTS OF PREGNANCY, CHILD-BIRTH, AND RELATED MEDICAL CONDITIONS UNDER THE SAME TERMS AND CONDITIONS OF COVERAGE FOR OTHER MEDICAL CONDITIONS. FOR EXAMPLE, IF THE MEDICAL PLAN COVERS ALL MEDICAL AND HOSPITAL COSTS OF EMPLOYEES, ALL THE COSTS RELATED TO PREGNANCY, CHILDBIRTH OR RELATED MEDICAL CONDITIONS MUST BE FULLY COVERED. THERE CAN BE NO SPECIAL CONDITIONS PLACED AS TO THE NUMBER OF DAYS OR DOLLAR AMOUNT UNLESS THAT LIMITATION APPLIES TO ALL DISABILITIES COVERED BY THE MEDICAL BENEFITS PLAN.

AGAIN, THIS BILL DOES NOT REQUIRE AN EMPLOYER TO HAVE A MEDICAL BENEFITS PLAN. HOWEVER, IF SUCH A PLAN EXISTS, AN EMPLOYER FOR A PERIOD OF ONE YEAR MAY NOT REDUCE THE BENEFITS TO COMPLY WITH THIS BILL, AND THE PLAN MUST COVER PREGNANCY, CHILDBIRTH, AND OTHER RELATED MEDICAL CONDITIONS.

### C. OTHER EMPLOYMENT POLICIES

IN ADDITION TO THE IMPACT OF THIS BILL ON FRINGE BENEFIT PROGRAMS, OTHER EMPLOYMENT POLICIES WHICH ADVERSELY AFFECT PREGNANT WORKERS ARE ALSO COVERED. THESE POLICIES INCLUDE: REFUSAL TO HIRE OR PROMOTE PREGNANT WOMEN; TERMINATION OF PREGNANT WOMEN; MANDATORY LEAVE FOR PREGNANT WOMEN ARBITRARILY ESTABLISHED AT A CERTAIN TIME DURING THEIR PREGNANCY AND NOT BASED ON THEIR INABILITY TO WORK; REINSTATEMENT RIGHTS, INCLUDING CREDIT FOR PREVIOUS SERVICE AND ACCRUED RETIREMENT BENEFITS; AND ACCUMULATED SENIORITY.

REGARDING SENIORITY, THE SUPREME COURT RECENTLY HELD IN THE SATTY CASE THAT DENYING SENIORITY TO ABSENT PREGNANT EMPLOYEES DURING LEAVES AS WELL AS DENYING COMPETITIVE SENIORITY FOR JOB BIDDING WHEN THEY RETURN, DOES IMPOSE A SUBSTANTIAL BURDEN ON WOMEN AND IS THEREFORE PROHIBITED BY TITLE VII.

ALTHOUGH RECENT ATTENTION HAS BEEN FOCUSED ON THE COVERAGE OF DISABILITY BENEFITS PROGRAMS, THE CONSEQUENCES OF OTHER DISCRIMINATORY EMPLOYMENT POLICIES ON PREGNANT WOMEN AND WOMEN IN GENERAL HAS HISTORICALLY HAD A PERSISTENT AND HARMFUL EFFECT UPON THEIR CAREERS. WOMEN ARE STILL SUBJECT TO THE STEREOTYPE THAT ALL WOMEN ARE MARGINAL WORKERS. UNTIL A WOMAN PASSES THE CHILD-BEARING AGE, SHE IS VIEWED **\*\*4755 \*7** BY EMPLOYERS AS POTENTIALLY PREGNANT. THEREFORE, THE ELIMINATION OF DISCRIMINATION BASED ON PREGNANCY IN THESE EMPLOYMENT PRACTICES IN ADDITION TO DISABILITY AND MEDICAL BENEFITS WILL GO A LONG WAY TOWARD PROVIDING EQUAL EMPLOYMENT OPPORTUNITIES FOR WOMEN, THE GOAL OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964.

### D. NONAPPLICABILITY OF SECTION 703(H)

IN ADDITION TO MANDATING EQUAL TREATMENT FOR PREGNANT WORKERS, SECTION 1 OF THE BILL EXPRESSLY PROVIDES THAT 'NOTHING IN SECTION 703(H) SHALL BE INTERPRETED TO PERMIT OTHERWISE'. THIS DISCLAIMER WAS NECESSITATED BY THE SUPREME COURT'S RELIANCE IN THE GILBERT CASE ON SECTION 703(H) OF TITLE VII ('THE BENNETT AMENDMENT') WHICH IN EFFECT PROVIDES THAT CERTAIN PRACTICES AUTHORIZED BY THE EQUAL PAY ACT, 29 U.S.C. 206(D), DO NOT VIOLATE TITLE VII. THE COURT IN GILBERT NOTED THAT A REGULATION ISSUED UNDER THE EQUAL PAY ACT PROVIDES THAT CERTAIN GENDER-BASED DIFFERENTIATIONS DO NOT VIOLATE THE EQUAL PAY ACT. (SEE 29 C.F.R. 800.116(D). WHILE THE GILBERT OPINION IS SOMEWHAT VAGUE AS TO THE PERTINENCE OF THIS REGULATION, IT DOES APPEAR THAT THE COURT REGARDED THE BENNETT AMENDMENT AND THE EQUAL PAY ACT REGULATION, TAKEN TOGETHER, AS SOMEHOW INSULATING PREGNANCY-BASED CLASSIFICATIONS FROM THE PROSCRIPTIONS OF TITLE VII.

THEREFORE, THE COMMITTEE DETERMINED THAT IT WAS NECESSARY TO EXPRESSLY REMOVE THE BENNETT AMENDMENT FROM THE PREGNANCY ISSUE IN ORDER TO ASSURE THE EQUAL TREATMENT OF PREGNANT WORKERS.

### E. ABORTION

BECAUSE THE BILL APPLIES TO ALL SITUATIONS IN WHICH WOMEN ARE 'AFFECTED BY PREGNANCY, CHILDBIRTH, AND RELATED MEDICAL CONDITIONS,' ITS BASIC LANGUAGE COVERS DECISIONS BY WOMEN WHO CHOSE TO TERMINATE THEIR PREGNANCIES. THUS, NO EMPLOYER MAY, FOR EXAMPLE, FIRE OR REFUSE TO HIRE A WOMAN SIMPLY BECAUSE SHE HAS EXERCISED HER RIGHT TO HAVE AN ABORTION.

MANY MEMBERS OF THE COMMITTEE WERE TROUBLED, HOWEVER, BY ANY IMPLICATION THAT AN EMPLOYER WOULD HAVE TO PAY FOR ABORTIONS NOT NECESSARY TO PRESERVE THE LIFE OF THE MOTHER THROUGH MEDICAL BENEFITS OR OTHER FRINGE BENEFIT PROGRAMS, EVEN IF THAT EMPLOYER-- A CHURCH ORGANIZATION FOR EXAMPLE-- HARBORED RELIGIOUS OR MORAL OBJECTIONS TO ABORTION; SUCH A REQUIREMENT, IT WAS FELT, COULD COMPROMISE THE RELIGIOUS FREEDOM OF SUCH EMPLOYERS. THE COMMITTEE, THEREFORE, AMENDED THE LANGUAGE OF THE BILL TO DEAL WITH THE PROBLEM, BY MAKING CLEAR THAT SUCH EMPLOYERS WILL NOT BE REQUIRED TO PAY FOR ABORTIONS EXCEPT WHERE THE LIFE OF THE MOTHER WOULD BE ENDANGERED IF THE FETUS WAS CARRIED TO TERM. AT THE SAME TIME, THE BILL AS AMENDED MAKES PLAIN THAT THERE IS NO INTENT TO ALTER THE EFFECT OF ANY OTHER LAWS, INCLUDING THE NATIONAL LABOR RELATIONS ACT, UPON THE QUESTION OF BENEFITS FOR ABORTION, OR TO FORBID EMPLOYERS TO PROVIDE SUCH BENEFITS IF THEY WISH TO.

FURTHER, THE EXCLUSION OF ABORTION BENEFITS FROM THE BILL IS INTENDED TO BE LIMITED TO BENEFITS FOR THE ABORTION ITSELF. IF A WOMAN SUFFERS COMPLICATIONS FROM AN ABORTION, MEDICAL PAYMENTS AND DISABILITY OR SICK LEAVE BENEFITS FOR THE TREATMENT OF THE COMPLICATIONS WOULD BE COVERED.

**\*\*4756 \*8** 2. TRANSITION PROVISIONS

AS THE GILBERT DECISION PERMITS EMPLOYERS TO EXCLUDE PREGNANCY-RELATED COVERAGE FROM EMPLOYEE BENEFIT PLANS, H.R. 6075 PROVIDES FOR TRANSITION PERIOD OF 180 DAYS TO ALLOW

EMPLOYEES TO COMPLY WITH THE EXPLICIT PROVISIONS OF THIS AMENDMENT. IT IS THE COMMITTEE'S INTENTION TO PROVIDE FOR AN ORDERLY AND EQUITABLE TRANSITION, WITH THE LEAST DISRUPTION FOR EMPLOYERS AND EMPLOYEES, CONSISTENT WITH THE PURPOSES OF THE BILL. SINCE THE BILL IS MERELY REESTABLISHING THE LAW AS IT WAS UNDERSTOOD PRIOR TO GILBERT BY THE EEOC AND BY THE LOWER COURTS AND AS IT NOW EXISTS IN MANY STATES, A PROTRACTED DELAY IN IMPLEMENTATION WOULD NOT BE APPROPRIATE. SIX MONTHS WAS SELECTED AS THAT PERIOD WHICH WOULD BE MORE THAN ADEQUATE TO PERMIT ORDERLY IMPLEMENTATION OF NEW COVERAGE AND WHICH WOULD ALSO RECOGNIZE THE PRESSING NEED TO MAKE NONDISCRIMINATORY COVERAGE MANDATORY AS SOON AS PRACTICABLE.

SECTION 2(A) PROVIDES FOR AN IMMEDIATE EFFECTIVE DATE INSOFAR AS THE BILL AFFECTS EMPLOYMENT POLICIES OTHER THAN FRINGE BENEFITS, INCLUDING REFUSING TO HIRE PREGNANT WOMEN, FIRING WOMEN WHO BECAME PREGNANT, DENYING SENIORITY, AND FORCING WOMEN TO TAKE MANDATORY MATERNITY LEAVE.

MANY, IF NOT ALL SUCH POLICIES, ARE PRESUMABLY INVALID UNDER PRESENT LAW AS INTERPRETED IN SATTY. FURTHER, SUCH POLICIES USUALLY DO NOT RESULT IN ANY COST-SAVING TO EMPLOYERS, AND ELIMINATING THEM WOULD NOT REQUIRE ANY ACTURIAL ADVICE OR SUBSTANTIAL ADMINISTRATIVE CHANGES. FINALLY, THESE POLICIES CAN HAVE LONG-TERM, RATHER THAN SHORT-TERM, EFFECTS ON WOMEN'S CAREERS, SO THEIR IMMEDIATE ELIMINATION IS VITAL.

SECTION 3 PROVIDES THAT EMPLOYERS WHO, ON THE DATE OF ENACTMENT, ARE IN VIOLATION OF THIS BILL AS TO FRINGE BENEFITS MAY NOT, IN ORDER TO COME INTO COMPLIANCE WITH THE ACT BY THE EFFECTIVE DATE PROVIDED BY SECTION 2(B), DECREASE BENEFITS OR COMPENSATION TO ANY EMPLOYEE WHO PAYS INSURANCE PREMIUMS, OR MAKES CONTRIBUTIONS TO A LABOR-MANAGEMENT JOINTLY TRUSTEED FRINGE BENEFIT FUND WHICH DOES NOT PROVIDE EQUAL COVERAGE AS THIS BILL WOULD REQUIRE, WOULD EITHER HAVE TO INCREASE PREMIUMS OR CONTRIBUTIONS SUFFICIENTLY TO COVER HIS/HER SHARE OF THE INCREMENTAL COST OF EQUAL BENEFITS FOR PREGNANT WOMEN, OR PAY EQUAL BENEFITS DIRECTLY TO AFFECTED WOMEN. HOWEVER, IF AN EMPLOYER NOW PAYS ONLY A PORTION OF THE COST OF INSURANCE OR OF THE TRUST FUND CONTRIBUTIONS, THE PREMIUMS OR CONTRIBUTIONS NEED ONLY BE INCREASED BY THAT SAME PORTION OF THE INCREMENTAL COST, AND EMPLOYEES GENERALLY (BUT NOT ONLY WOMEN, OR ONLY PREGNANT WOMEN) WOULD HAVE TO PAY THEIR USUAL PORTION OF THE INCREMENT.

SECTION 3 ALSO RECOGNIZES THAT THERE ARE MANY REASONS WHY EMPLOYEE FRINGE BENEFITS PROGRAMS ARE ALTERED IN A WAY WHICH COULD REDUCE BENEFITS TO SOME EMPLOYEES. FOR EXAMPLE, DECISIONS TO CHANGE INSURANCE CARRIERS MAY LEAD TO ALTERATIONS IN A PLAN DETRIMENTAL TO SOME INDIVIDUALS SIMPLY BECAUSE ONE COMPANY OFFERS A DIFFERENT PACKAGE THAN ANOTHER AT THE SAME COST. THIS BILL WOULD NOT FREEZE BENEFIT PLANS IN EXISTENCE WHEN IT IS ENACTED, BUT WOULD ALLOW ALL CHANGES WHICH THE EMPLOYER CAN DEMONSTRATE ARE FOR REASONS ENTIRELY INDEPENDENT OF THIS BILL.

**4757 *9 THIS LIMITATION IN H.R. 6075 ON AN EMPLOYER'S ABILITY TO REDUCE BENEFITS FOR PURPOSES OF COMPLIANCE IS NOT NOVEL. THE EQUAL PAY ACT EXPRESSLY PROVIDES THAT

* * * AN EMPLOYER WHO IS PAYING A WAGE RATE DIFFERENTIAL IN VIOLATION OF THIS SUBSECTION SHALL NOT, IN ORDER TO COMPLY WITH THE PROVISIONS OF THIS SUBSECTION, REDUCE THE WAGE RATE OF ANY EMPLOYEE. 29 U.S.C. 206(D)(1).

IT MUST BE EMPHASIZED IN THIS REGARD THAT THE ONE YEAR LIMITATION IN H.R. 6075 MUST NOT BE CONSTRUED AS PERMISSION FOR EMPLOYERS WHO DO NOT COMPLY IMMEDIATELY TO REDUCE BENEFITS BECAUSE OF THE BILL SIMPLY BECAUSE THE TIME LIMIT HAS RUN.

SECTION 3 DOES NOT LIMIT THE REMEDIAL DESCRETION OF COURTS WHEN CASES ARE BROUGHT ALLEGING NONCOMPLIANCE WITH SECTION 1 AS INCORPORATED IN TITLE VII AFTER THE BILL IS EFFECTIVE. RATHER, ORDINARY TITLE VII REMEDIAL PRINCIPLES THEN WOULD APPLY. IN ALL OF THE PRE-GILBERT PREGNANCY CASES, FOR EXAMPLE, THIS ALWAYS MEANT REQUIRING THE EMPLOYER TO PAY THE WOMEN DISCRIMINATED AGAINST MORE, RATHER THAN PAYING THE OTHER EMPLOYEES LESS.

## COST ESTIMATE: IMPACT OF LEGISLATION

NO ADDITIONAL COST TO THE GOVERNMENT WILL BE INCURRED AS A RESULT OF ENACTMENT OF THIS BILL. COST ESTIMATES WERE PROVIDED TO THE COMMITTEE BY A NUMBER OF SOURCES, PUBLIC AND PRIVATE, BY SUPPORTERS AND OPPONENTS OF THE BILL. THE BILL WILL INCREASE EMPLOYER COSTS IN TWO AREAS: DISABILITY INSURANCE AND HEALTH INSURANCE. WITH RESPECT TO DISABILITY INSURANCE, IT IS POSSIBLE TO PREDICT THE COST WITH A FAIRLY SUBSTANTIAL DEGREE OF RELIABILITY; HEALTH INSURANCE COSTS HAVE PROVED FAR MORE DIFFICULT TO PREDICT, FOR REASONS WHICH WILL BE EXPLAINED BELOW.

### 1. DISABILITY BENEFITS

THE COST ESTIMATES FOR DISABILITY INSURANCE RANGED FROM A LOW OF $130 MILLION (AFL-CIO) TO A HIGH OF $571 MILLION (HEALTH INSURANCE ASSOCIATION OF AMERICA). HOWEVER, THE COMMITTEE BELIEVES THE LABOR DEPARTMENT'S $191.5 MILLION ESTIMATE IS THE BEST AVAILABLE ESTIMATE. THE LABOR DEPARTMENT'S FIGURES ASSUME AN AVERAGE DISABILITY DURATION OF SEVEN AND ONE HALF WEEKS, AN AVERAGE WEEKLY BENEFIT AMOUNT OF $80, AND A BIRTH RATE OF 66.7 BIRTHS PER 1,000 WOMEN 15 TO 44 YEARS OF AGE. FURTHER, DOL TOOK INTO ACCOUNT MORE PRECISELY THAN THE OTHERS THE PERCENTAGE OF WORKING WOMEN WHO WOULD BENEFIT FROM THE BILL. MOST SIGNIFICANTLY, DOL'S FINAL ESTIMATE DOES NOT INCLUDE WORKERS ALREADY COVERED FOR PREGNANCY, DISABILITY (EITHER BECAUSE OF STATE LAW REQUIREMENTS OR BECAUSE THEIR EMPLOYERS HAVE CHOSEN TO PROVIDE SUCH COVERAGE), A FACTOR ALL OF THE HIGHER ESTIMATES FAIL TO TAKE INTO ACCOUNT. A DETAILED EXPLANATION OF THE DOL ESTIMATE APPEARS ON PAGE 180 OF THE RECORD OF HEARINGS BEFORE THE SUBCOMMITTEE ON EMPLOYMENT OPPORTUNITIES OF THE COMMITTEE ON EDUCATION AND LABOR, ON H.R. 5055 AND H.R. 6075 (APRIL 6, 1977).

TRANSLATING ITS NATIONAL TOTAL ESTIMATE TO COST INCREASE PER EMPLOYEE, DOL CONCLUDES:

**\*\*4758 \*10** WE ESTIMATE THAT THE COST INCREASE OF H.R. 6075 WILL AMOUNT TO TWENTY CENTS PER WEEK PER WORKER, FOR EMPLOYEES NOW COVERED UNDER A TDI PLAN WHICH EXCLUDES PREGNANCY. THERE WILL BE A COST INCREASE OF FOUR CENTS PER WEEK PER WORKER FOR EMPLOYEES NOW COVERED UNDER TDI PLANS WHICH PROVIDE LIMITED PREGNANCY DISABILITY BENEFITS. THE DEPARTMENT'S ESTIMATE OF THE TOTAL COST INCREASES (INCLUDING ADMINISTRATIVE COSTS) IS $191.5 MILLION, OR ONLY 3.5 PERCENT OF TOTAL CONTRIBUTIONS REQUIRED. THESE TOTAL DOLLAR AMOUNTS ARE RELEVANT ONLY WHEN COMPARED TO CONTRIBUTIONS, NUMBER OF WORKERS, OR TOTAL PAYROLL. WE BELIEVE IT IS ALSO ESSENTIAL TO NOTE THAT TEMPORARY DISABILITY INSURANCE CONTRIBUTIONS REPRESENT 1.4 PERCENT OF THE WAGE PACKAGE FOR COVERED WORKERS IN PRIVATE INDUSTRY AND

H.R. 6075 WILL INCREASE THAT PERCENTAGE ONLY TO 1.50 PERCENT. THIS TOTAL AMOUNTS TO ONLY 1 1/2 CENTS PER DOLLAR OF WAGES.

GENERALLY, IT IS NOT ANTICIPATED THAT DISABILITY BENEFIT COSTS WILL RISE SUBSTANTIALLY. FOR INSTANCE, CALIFORNIA'S DISABILITY INSURANCE PROGRAM FOR PREGNANT WOMEN, ENACTED IN 1976, AND PROVIDING FOR BENEFITS FOR 3 WEEKS PRIOR TO DELIVERY AND 3 WEEKS AFTER, HAS GIVEN THE STATE A $52 MILLION SURPLUS.

CALIFORNIA'S EXPERIENCE SHOWS THAT ONLY $13.2 MILLION IN BENEFITS WERE CLAIMED IN 1977 ALTHOUGH PAYROLL TAXES TO PAY FOR THE PROGRAM RAISED $65.3 MILLION. ONLY 40,708 CLAIMS WERE FILED FOR BENEFITS INSTEAD OF 115,000 EXPECTED AND THE AVERAGE BENEFIT PAID TO WOMEN WAS LESS THAN PREDICTED.

### 2. HEALTH INSURANCE

WITNESSES WHO TESTIFIED BEFORE THE SUBCOMMITTEE WERE UNABLE TO PRODUCE RELIABLE COST ESTIMATES FOR HEALTH INSURANCE. THERE ARE SEVERAL REASONS FOR THIS: FIRST, BECAUSE OF THE UNAVAILABILITY OF SUFFICIENT DATA, THEY WERE UNABLE TO ESTIMATE THE COSTS WHICH MIGHT BE INCURRED UNDER MEDICAL BENEFIT PLANS UNDER THIS LEGISLATION. SECONDLY, MATERNITY HOSPITAL COSTS AND DELIVERY COSTS WHICH VARY WIDELY THROUGHOUT THE UNITED STATES WOULD HAVE TO BE OBTAINED. FINALLY, EXISTING HEALTH PLANS VARY IN THEIR TREATMENT OF PREGNANCY AS WELL AS OTHER CONDITIONS, MAKING IT DIFFICULT TO SUPPORT COST ESTIMATES.

THE COST OF THIS LEGISLATION WOULD NOT INCLUDE THE PROVISION OF MEDICAL BENEFITS FOR MATERNITY IN STATES, SUCH AS NEW YORK, WHERE INSURANCE FOR MATERNITY IS MANDATORY UNDER STATE LAW. NOR WOULD THE COST OF THIS LEGISLATION INCLUDE ADJUSTMENTS TO PROVIDE NONDISCRIMINATORY COVERAGE OF MEDICAL CONDITIONS RELATED TO PREGNANCY WHERE NONDISCRIMINATION IS ALREADY MANDATED BY STATE LAW.

### STATE TREATMENT OF PREGNANCY

THE REQUIREMENT OF FRINGE BENEFIT COVERAGE OF WORKERS DISABLED BY PREGNANCY AND RELATED CONDITIONS TAKES TWO BASIC FORMS UNDER STATE LAW: (1) A PROVISION FOR COVERAGE IN SOME FORM UNDER A STATE DISABILITY INSURANCE LAW OF (2) A REQUIREMENT OF EQUAL TREATMENT OF PREGNANT WORKERS UNDER A STATE FAIR EMPLOYMENT PRACTICES LAW. THE REQUIREMENTS IN (2) ARE IN SOME STATES EXPLICITLY SET FORTH IN THE STATE FEP LAW OR IN OTHER STATES MAY RESULT FROM AGENCY INTERPRETATIONS (EITHER **4759 *11 IN REGULATIONS OR AGENCY OPINIONS) OR STATE COURT DECISIONS. AT LEAST 22 STATES, INCLUDING THE MOST POPULOUS STATES, NOW MANDATE SOME FORM OF PREGNANCY DISABILITY COVERAGE THROUGH ONE OF THE MECHANISMS DESCRIBED ABOVE. THE SIGNIFICANCE OF THIS STATE COVERAGE FOR H.R. 6075 IS MANIFOLD: FIRST, MANY EMPLOYERS ARE ALREADY UNDER A STATE LAW OBLIGATION TO PROVIDE BENEFITS TO PREGNANT DISABLED WORKERS. PASSAGE OF THE BILL THUS HAS LITTLE OR NO ECONOMIC IMPACT ON SUCH EMPLOYERS. SECOND, EMPLOYERS WHO OPERATE IN SEVERAL STATES FACE DIFFERENT REQUIREMENTS DEPENDING ON THE STATE; LIKEWISE, THE RIGHTS OF PREGNANT EMPLOYEES DEPEND ON THE LAWS OF THE STATE IN WHICH THEY ARE EMPLOYED.

THE FOLLOWING SIX STATES, AS WELL AS THE DISTRICT OF COLUMBIA, SPECIFICALLY INCLUDE PREGNANCY IN THEIR FAIR EMPLOYMENT PRACTICES LAWS: ALASKA, CONNECTICUT, MARYLAND, MINNESOTA, OREGON, AND MONTANA.

TWELVE ADDITIONAL STATES HAVE, SINCE GILBERT INTERPRETED THE PROHIBITIONS ON SEX DISCRIMINATION IN THE STATE'S FEP LAWS TO REQUIRE EQUAL TREATMENT OF PREGNANT WORKERS. IN THREE INSTANCES, STATE COURTS HAVE SO INTERPRETED THE STATE FEP LAWS (NEW YORK, PENNSYLVANIA, WISCONSIN); IN AT LEAST NINE ADDITIONAL STATES, THE STATE ENFORCEMENT AGENCY HAS SO CONSTRUED THE STATE LAW. THOSE STATES ARE: ILLINOIS, INDIANA, IOWA, KANSAS, MASSACHUSETTS, MICHIGAN, MISSOURI, SOUTH DAKOTA, AND WASHINGTON.

OTHER STATE FEP LAWS MAY BE SO INTERPRETED IN THE FUTURE. NONE OF THE STATE LAWS WHICH REQUIRE COVERAGE OF PREGNANCY IN DISABILITY BENEFIT PROGRAMS HAS AN ABORTION EXCEPTION. SPECIFICALLY, THE FOLLOWING EIGHT STATES REQUIRE COVERAGE OF ABORTION: HAWAII, KANSAS, MASSACHUSETTS, NEW JERSEY, NEW YORK, PENNSYLVANIA, RHODE ISLAND AND WISCONSIN.

FINALLY, FIVE STATES HAVE TEMPORARY DISABILITY LAWS UNDER WHICH EMPLOYEES OF PRIVATE EMPLOYERS ARE ASSURED PARTIAL WAGE REPLACEMENT IF THEY BECOME TEMPORARILY DISABLED. EACH OF THOSE FIVE STATES REQUIRES COVERAGE OF DISABILITIES ARISING FROM PREGNANCY, ALTHOUGH THE EXTENT OF COVERAGE VARIES. THOSE STATES, AND THE TYPE OF COVERAGE REQUIRED, ARE AS FOLLOWS:

CALIFORNIA

COVERAGE FOR COMPLICATIONS OF PREGNANCY AND CHILDBIRTH ON SAME BASIS AS OTHER DISABILITIES. DISABILITY ASSOCIATED WITH NORMAL CHILDBIRTH-MAXIMUM COVERAGE OF THREE WEEKS BEFORE AND THREE WEEKS AFTER CHILDBIRTH.

HAWAII

PREGNANCY-RELATED DISABILITIES TREATED LIKE ALL OTHER DISABILITIES.

NEW JERSEY

COVERAGE FOR COMPLICATIONS OF PREGNANCY AND CHILDBIRTH ON SAME BASIS AS OTHER DISABILITIES. DISABILITY ASSOCIATED WITH NORMAL CHILDBIRTH-- MAXIMUM COVERAGE OF FOUR WEEKS BEFORE AND FOUR WEEKS AFTER CHILDBIRTH.

NEW YORK

SAME AS CALIFORNIA AND NEW JERSEY. EIGHT WEEK LIMIT ON BENEFITS FOR DISABILITIES ARISING FROM NORMAL (UNCOMPLICATED) CHILDBIRTH.

RHODE ISLAND

$250 MAXIMUM FOR PREGNANCY-RELATED DISABILITIES.

CONGRESSIONAL BUDGET OFFICE COST ESTIMATE

IN RESPONSE TO A REQUEST SUBMITTED BY CHAIRMAN HAWKINS OF THE SUBCOMMITTEE ON EMPLOYMENT OPPORTUNITIES, THE CONGRESSIONAL **\*\*4760 \*12** BUDGET OFFICE COMPLETED A COST ASSESSMENT OF H.R. 6075, RESULTING IN THE ISSUANCE OF THE FOLLOWING CORRESPONDENCE:

CONGRESSIONAL BUDGET OFFICE,

U.S. CONGRESS,

WASHINGTON, D.C., FEBRUARY 15, 1978.

HON. AUGUSTUS F. HAWKINS,

CHAIRMAN, SUBCOMMITTEE ON EMPLOYMENT OPPORTUNITIES, COMMITTEE ON EDUCATION AND LABOR, U.S. HOUSE OF REPRESENTATIVES, WASHINGTON, D.C.

DEAR MR. CHAIRMAN: PURSUANT TO SECTION 403 OF THE CONGRESSIONAL BUDGET ACT OF 1974, THE CONGRESSIONAL BUDGET OFFICE HAS REVIEWED H.R. 6075, A BILL TO AMEND TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 TO PROHIBIT SEX DISCRIMINATION ON THE BASIS OF PREGNANCY, AS ORDERED REPORTED BY THE SUBCOMMITTEE ON EMPLOYMENT OPPORTUNITIES, FEBRUARY 2, 1978.

BASED ON THIS REVIEW, IT APPEARS THAT NO ADDITIONAL COST TO THE GOVERNMENT WOULD BE INCURRED AS A RESULT OF ENACTMENT OF THIS BILL.

SINCERELY,

ROBERT A. LEVINE,

(FOR ALICE M. RIBLIN, DIRECTOR).

THE COMMITTEE CONCURS WITH THE COST ESTIMATE OF THE CONGRESSIONAL BUDGET OFFICE.

INFLATION IMPACT

IN COMPLIANCE WITH CLAUSE (2)(1)(4) OF RULE XI OF THE RULES OF THE HOUSE OF REPRESENTATIVES, THE COMMITTEE ESTIMATES THAT THE INFLATIONARY IMPACT OF THE BILL WILL NOT BE SIGNIFICANT.

THE BILL CONTEMPLATES NO GOVERNMENT SPENDING, AND THE PRIVATE SECTOR COSTS ASSOCIATED WITH THE EXPANSION OF FRINGE BENEFIT COVERAGE OCCASIONED BY THIS LEGISLATION OVER THAT CURRENTLY PROVIDED WILL BE OF RELATIVELY SMALL CONSEQUENCE (E.G., THE DEPARTMENT OF LABOR HAS STATED THAT 'TEMPORARY DISABILITY INSURANCE CONTRIBUTIONS REPRESENT ONLY 1.4 PERCENT OF THE WAGE PACKAGE FOR COVERED WORKERS IN PRIVATE INDUSTRY AND H.R. 6075 WILL INCREASE THAT PERCENTAGE ONLY TO 1.50 PERCENT.' [2]

BECAUSE THIS BILL WILL ENCOURAGE WOMEN TO REMAIN IN THE WORK FORCE DURING AND AFTER PREGNANCY, IT SHOULD OPERATE TO REDUCE EMPLOYEE REPLACEMENT, RETRAINING

AND UNEMPLOYMENT COMPENSATION COSTS WHILE INCREASING LABOR MARKET STABILITY AND PRODUCTIVITY.

OVERSIGHT

IN COMPLIANCE WITH CLAUSE 2(1)(3)(D) OF RULE XI OF THE RULES OF THE HOUSE OF REPRESENTATIVES, THE COMMITTEE STATES THAT NO OVERSIGHT FINDINGS OR RECOMMENDATIONS OF THE COMMITTEE ON GOVERNMENT OPERATIONS WERE SUBMITTED TO THE COMMITTEE. THE COMMITTEE HAS MADE NO OVERSIGHT FINDINGS WITH RESPECT TO THE PREGNANCY DISABILITY ISSUE DURING THIS SESSION OF CONGRESS.

**4761 *13 SECTION-BY-SECTION ANALYSIS

SECTION 1

THIS SECTION AMENDS SECTION 701 OF THE CIVIL RIGHTS ACT OF 1964 BY ADDING A NEW SUBSECTION 701(K) WHICH BROADENS THE DEFINITION OF SEX DISCRIMINATION IN THE ACT TO INCLUDE DISCRIMINATION ON THE BASIS OF PREGNANCY, CHILDBIRTH OR RELATED MEDICAL CONDITIONS. IT ALSO MAKES CLEAR THAT FRINGE BENEFIT PROGRAMS MUST TREAT WOMEN AFFECTED BY THOSE CONDITIONS EQUALLY TO OTHER EMPLOYEES ON THE BASIS OF THEIR ABILITY OR INABILITY TO WORK, EXCEPT IN REGARD TO BENEFITS FOR ABORTIONS NOT NECESSARY TO PRESERVE THE LIFE OF THE MOTHER; AND THAT NOTHING IN SECTION 703(H) OF THE ACT MAY BE INTERPRETED TO PERMIT OTHERWISE.

SEC. 2

SECTION 2(A) OF THIS SECTION OF THE BILL SPECIFIES AN IMMEDIATE EFFECTIVE DATE FOR THE PROHIBITION OF DISCRIMINATION ON THE BASIS OF PREGNANCY, CHILDBIRTH OR RELATED MEDICAL CONDITIONS, EXCEPT AS PROVIDED IN SECTION 2(B). SECTION 2(B) SPECIFIES AN EFFECTIVE DATE 180 DAYS AFTER THE DATE OF ENACTMENT FOR THE RECEIPT OF EQUAL BENEFITS UNDER FRINGE BENEFIT PROGRAMS.

SEC. 3

PROHIBITS THE REDUCTION OF BENEFITS AS A MEANS OF COMPLIANCE WITH THE ACT AT LEAST FOR A PERIOD OF 1 YEAR AFTER THE DATE OF ENACTMENT, OR UNTIL THE EXPIRATION OF ANY APPLICABLE COLLECTIVE BARGAINING AGREEMENT. HOWEVER, IT ALSO MAKES CLEAR THE FACT THAT THE COST OF INCREASING BENEFITS MAY BE APPORTIONED BETWEEN EMPLOYERS AND EMPLOYEES, IF PRESENT COSTS ARE APPORTIONED, AND THAT BENEFITS MAY BE REDUCED AT ANY TIME IF THE EMPLOYER CAN SHOW REASONS OTHER THAN COMPLIANCE WITH THIS LEGISLATION.

\* \* \* \*

*15 DISSENTING VIEWS OF MR. WEISS

THE ORIGINAL CONCEPT OF THIS LEGISLATION WAS TO PROVIDE A LEGISLATIVE REMEDY FOR AN ADVERSE SUPREME COURT RULING WHICH SAID THAT WOMEN WORKERS WHO BECAME PREGNANT DID NOT HAVE TO BE COVERED BY DISABILITY PLANS. H.R. 6075, AS ORIGINALLY PROPOSED, IS AN

AMENDMENT TO THE CIVIL RIGHTS ACT OF 1965; ITS PURPOSE BEING TO INSURE EQUAL TREATMENT OF WOMEN IN EMPLOYMENT-RELATED MATTERS.

IN APPENDING AN ANTI-ABORTION RIDER TO THIS LEGISLATION, THE COMMITTEE HAS BEEN DIVERTED FROM THE ORIGINAL PURPOSE OF PROTECTING THE RIGHTS OF WOMEN EMPLOYEES TO PROTECTING THE RIGHTS OF THEIR EMPLOYERS. I VOTED AGAINST THE BILL AS REPORTED WITH THE ANTI-ABORTION LANGUAGE BECAUSE IT ADDS A NEW FORM OF DISCRIMINATION IN PLACE OF THE ONE IT SEEKS TO ELIMINATE.

ANTI-ABORTION LANGUAGE WILL NOT PROTECT EMPLOYERS: IT WILL MAKE THEM TARGETS

THERE IS A GREAT IRONY ABOUT THE DECISION OF THE COMMITTEE. EVERY MEMBER KNOWS THAT EMPLOYERS AND THEIR REPRESENTATIVES ARE QUITE CAPABLE OF PRESENTING THEIR VIEWS ON ISSUES WHICH COME BEFORE US; DURING THE COURSE OF THE 95TH CONGRESS, EVERY MEMBER OF THE COMMITTEE HAS RECEIVED LITERALLY THOUSANDS OF PIECES OF CORRESPONDENCE **4762 CONCERNING SUCH ISSUES AS COMMON SITUS PICKETING, MINIMUM WAGE, AND LABOR LAW REFORM, TO NAME JUST A FEW. YET NOT ONE EMPLOYER WHO ALLEGEDLY WOULD BE PROTECTED BY THE ANTI-ABORTION PROVISION HAS COME FORWARD TO PROMOTE IT.

IT IS LOGICAL TO ASK, WHY? BECAUSE THIS AMENDMENT WILL NOT PROTECT EMPLOYERS; IT WILL TURN THE FOCUS OF THE BATTLE OVER ABORTION DIRECTLY ON TO THEM. I AM SURE THAT THERE WILL BE ATTEMPTS BY THE OPPONENTS OF ABORTION COVERAGE TO HAVE MAJOR CORPORATIONS ELIMINATE SUCH COVERAGE IN THEIR BENEFIT PLANS; LIKEWISE, SMALLER BUSINESSES WILL BE SUBJECT TO PRESSURE TO ALTER THEIR BENEFITS PACKAGES. I AM SURE THAT NEITHER EMPLOYERS NOT LABOR UNIONS BARGAINING COLLECTIVELY WITH THEM WILL BE PLEASED BY SUCH A PROSPECT.

UNEQUAL TREATMENT OF WOMEN WILL CONTINUE: EARNED BENEFITS MAY BE DENIED THEM

WHILE EXPOSING EMPLOYERS TO NEW-- AND UNEXPECTED-- PRESSURES, THE ANTI-ABORTION PROVISION WILL PERPETUATE UNEQUAL TREATMENT FOR WOMEN WORKERS. HEALTH BENEFITS ARE NOT GIFTS OF THE EMPLOYER TO THE EMPLOYEE; LIKE WAGES AND OTHER FRINGE BENEFITS, THEY ARE EARNED. IN MANY CASES, EMPLOYEES ARE CONTRIBUTING TO THEIR HEALTH BENEFIT PLANS; ACCORDING TO FIGURES MADE AVAILABLE BY THE SOCIAL SECURITY ADMINISTRATION, ONE-THIRD OF ALL HEALTH PLANS ARE CONTRIBUTED TO SOLELY OR IN PART BY EMPLOYEES. THE DISCRIMINATORY ASPECT OF THE ANTI-ABORTION LANGUAGE IS OBVIOUS: MALE EMPLOYEES-- REGARDLESS OF WHETHER THEY HAVE CONTRIBUTED *16 TO THEIR HEALTH PLANS OR NOT-- WOULD BE COVERED FOR ALL SURGICAL PROCEDURES; FEMALE EMPLOYEES-- EVEN IF THERE IS NO EMPLOYER CONTRIBUTION-- WOULD BE SUBJECT TO EMPLOYER DISCRETION CONCERNING COVERAGE FOR ABORTION. THE DISCRIMINATORY ASPECT COULD NOT BE MORE BLATANT.

THE COMMITTEE'S ACTION EFFECTS HEALTH INSURANCE
PLANS WITHOUT KNOWING HOW THEY OPERATE

UNLIKE THE ISSUE OF PREGNANCY DISABILITY, THE ABORTION EXCLUSION HAS NOT BEEN ADOPTED WITH ANY UNDERSTANDING OF CURRENT HEALTH INSURANCE PRACTICES. THERE ARE 51,600 DIFFERENT HEALTH INSURANCE PLANS AVAILABLE TO 58.2 MILLION AMERICANS IN THE PRIVATE SECTOR WHO CONTRIBUTE SOME $27.1 BILLION FOR COVERAGE. FIFTY-FIVE PERCENT OF THESE PLANS ARE NEGOTIATED; 45 PERCENT ARE NOT.

ABORTION COVERAGE IS NOW COMMON

ACCORDING TO THE NATIONAL ASSOCIATION OF INSURANCE COMMISSIONERS. AND THE HEALTH INSURANCE ASSOCIATION OF AMERICA, ABORTION COVERAGE IS NOW COMMON IN MOST HEALTH INSURANCE PLANS. SPOKESMEN FOR THESE REPRESENTATIVES OF THE INDUSTRY INDICATED TO MEMBERS OF MY STAFF THAT CURRENTLY THERE IS NO BAN ON SPECIFIC SURGICAL PROCEDURES EITHER BY LAW OR REGULATION REGARDING PRIVATE INSURANCE COVERAGE.

FINANCIAL CONTRIBUTION OF EMPLOYERS IS 'INSIGNIFICANT'

I KNOW THAT ONE OF THE CONCERNS OF THE MEMBERS OF THE COMMITTEE WHO APPROVED THE ABORTION EXCLUSION WAS THE FEAR THAT SOME EMPLOYERS WOULD BE FORCED TO MAKE GREAT FINANCIAL CONTRIBUTIONS TO ABORTION **4763 SERVICES IF THE AMENDMENT HAD NOT BEEN ADOPTED. INDUSTRY REPRESENTATIVES HAVE STATED TO MY OFFICE THAT THERE ARE NO INDUSTRYWIDE STATISTICS ON ABORTION, BUT ADDED THAT ABORTION AS A PROCEDURE AFFECTING INSURANCE PREMIUMS IS 'INSIGNIFICANT.'

ALSO, INSURANCE INDUSTRY REPRESENTATIVES WERE UNABLE TO PREDICT THAT PRECLUDING ABORTIONS WOULD RESULT IN A LOWERING OF PREMIUMS TO EMPLOYERS; THEY WERE NOT ABLE TO SPECULATE AS TO WHAT PERCENTAGE OF THE AVERAGE HEALTH PLAN PREMIUM WOULD BE APPLIED FOR ABORTION SERVICES. AGAIN, THEY DID SAY IT WOULD BE INSIGNIFICANT.

MOST LIKELY RESULT OF THE ANTIABORTION AMENDMENT:
NO CHANGE IN PREMIUMS AND A LOSS OF COVERAGE

AS A RESULT OF THE ADOPTION OF THIS AMENDMENT, WE MAY FIND OURSELVES IN A SITUATION WHERE THERE IS NO CHANGE IN THE EMPLOYER'S CONTRIBUTION FOR HEALTH BENEFITS, BUT BENEFITS WHICH ARE EARNED BY WOMEN AND WHICH THEY CURRENTLY HAVE WOULD BE ELIMINATED.

RELIGIOUS INSTITUTIONS ARE PROTECTED

THE OTHER MAJOR CONCERN OF MANY MEMBERS OF THE COMMITTEE IS WHETHER RELIGIOUS INSTITUTIONS WOULD BE FORCED TO PROVIDE ABORTION COVERAGE BY VIRTUE OF THIS LEGISLATION. THEY WOULD NOT. SENATOR JACOB JAVITS, IN HIS PRESENTATION BEFORE THE SENATE, STATED THAT IT WAS NOT THE INTENTION NOR DESIGN OF THE SPONSORS OF THIS LEGISLATION TO INTERFERE WITH THE FIRST AMENDMENT RIGHTS OF A CHURCH WHICH HAS A RELIGIOUS *17 TENET RESPECTING ABORTION; THE CHURCH'S POSITION, ACCORDING TO SENATOR JAVITS, IS PROTECTED UNDER THE FIRST AMENDMENT.

ALSO, AS WE KNOW, SECTION 702 OF THE CIVIL RIGHTS ACT, ALLOWS RELIGIOUS INSTITUTIONS TO HIRE SOLELY MEMBERS OF THEIR OWN FAITH. IT IS DOUBTFUL THAT AN EMPLOYEE-MEMBER OF A CHURCH WHICH PROHIBITS ABORTIONS WOULD SEEK ABORTION COVERAGE FROM THE CHURCH. INDEED, THERE HAS NEVER BEEN A COURT CASE CONCERNING FAILURE TO COVER ABORTIONS BY EITHER A SECULAR OR RELIGIOUS INSTITUTION.

STATES HAVE PROMOTED SIMILAR LEGISLATION WITHOUT EXCLUSIONS

THE STATES HAVE TAKEN AN ACTIVE ROLE CONCERNING PREGNANCY DISABILITY LEGISLATION. HALF THE STATES NOW INTERPRET THEIR FAIR EMPLOYMENT PRACTICES LEGISLATION TO PROHIBIT SEX DISCRIMINATION ON THE BASIS OF PREGNANCY AND CHILD BIRTH. CONNECTICUT AND MINNESOTA HAVE RECENTLY ADOPTED LEGISLATION BASED ON THE UNAMENDED VERSION OF H.R. 6075. NOT ONE STATE HAS ANTI-ABORTION LANGUAGE IN ITS LAWS CONCERNING PREGNANCY DISABILITY AND IN NOT ONE STATE IS THERE LEGISLATIVE ACTIVITY TO INCLUDE SUCH A BAN.

SUPPORT FOR AN UNAMENDED BILL COMES FROM BOTH SIDES OF THE ABORTION DISCUSSION

THE VERY NATURE OF THIS BILL-- UNAMENDED-- IS TO HELP WOMEN CARRY THEIR PREGNANCIES TO TERM. IN ITS ORIGINAL FORM, THE LEGISLATION WAS SUPPORTED BY A DIVERSE COALITION OF PRO-LIFE, LABOR, AND WOMEN'S ORGANIZATIONS. MANY OF THESE GROUPS BELIEVE THAT AN ABORTION PROVISION IS UNNECESSARY IN THIS LEGISLATION.

**\*\*4764** DURING THE JUNE 29, 1977, HEARING WHICH THE SUBCOMMITTEE ON EMPLOYMENT OPPORTUNITIES CONDUCTED, DR. DOROTHY CZARNECKI, A REPRESENTATIVE OF THE AMERICAN CITIZENS CONCERNED FOR LIFE, OF PHILADELPHIA, PA., RESPONDED IN THE FOLLOWING MANNER WHEN I ASKED HER IF THIS LEGISLATION, H.R. 6075, INCREASES THE LIKELIHOOD OF ABORTION:

DR. CZARNECKI. THIS LEGISLATION WOULD SAVE BABIES IN MY OPINION. IT WOULD ENCOURAGE A WOMAN TO KEEP A PREGNANCY OR DO WHAT SHE WANTS. IT GIVES THE WOMAN A CHOICE.

IN FURTHER QUESTIONING, I ASKED:

IN THE EVENT A FEMALE EMPLOYEE DECIDES TO ABORT A PREGNANCY, DO YOU THINK THAT THE EMPLOYEE SHOULD BE DENIED MEDICAL COVERAGE AND DISABILITY FROM COMPLICATIONS RESULTING FROM THE MEDICAL PROCEDURE?

DR. CZARNECKI. I FEEL WE SHOULD TREAT THIS AS A CONDITION, PERIOD.

THE LIST OF SUPPORTERS FOR THIS LEGISLATION WITHOUT AN ABORTION AMENDMENT IS ENDLESS; IT INCLUDES MANY GROUPS WITH WHOM ALL OF US WORK REGULARLY:

AFL-CIO.

AFSCME.

LEADERSHIP CONFERENCE ON CIVIL RIGHTS.

NEA.

LEAGUE OF WOMEN VOTERS.

UNITED AUTO WORKERS.

UNITED STEEL WORKERS.

INTERNATIONAL LADIES GARMENT WORKERS UNION.

COALITION OF LABOR UNION WOMEN.

AMERICAN ASSOCIATION OF UNIVERSITY WOMEN.

***18** ONE GROUP, ALONE, LOBBIED FOR THE AMENDMENT

THE ONLY GROUP WHICH ACTIVELY CAME FORWARD TO PROMOTE THE ANTI-ABORTION PROVISION WAS THE UNITED STATES CATHOLIC CONFERENCE, THE CONFERENCE OF BISHOPS, AND NEVER AT A PUBLIC HEARING. IN FACT, THERE IS NOT A SINGLE WORD OF TESTIMONY ON THE RECORD SUPPORTING THE ANTI-ABORTION AMENDMENT IN THIS BILL.

PREGNANCY DISABILITY COVERAGE FACES AN UNCERTAIN FUTURE AS A RESULT OF THE ANTI-ABORTION LANGUAGE: WOMEN WILL SUFFER

DURING THE COURSE OF THE 95TH CONGRESS, THE MEMBERS OF CONGRESS HAVE HAD 11 OPPORTUNITIES TO MAKE THEIR POSITION KNOWN ON THE ISSUE OF FEDERAL FUNDING OF ABORTION; UNLIKE THE HYDE AMENDMENT, THIS LEGISLATION, UNAMENDED, DOES NOT INVOLVE PUBLIC SUBSIDIZATION OF ABORTION.

WE ARE NOW FACED WITH THE PROSPECT THAT PREGNANCY DISABILITY LEGISLATION WILL NOT BE ENACTED THIS YEAR AS A RESULT OF THE FEARS OF THE MEMBERS OF THIS COMMITTEE. THE SENATE HAS VOTED NOT TO APPEND AN ANTI-ABORTION RIDER TO THEIR VERSION OF THIS LEGISLATION; OUR 5-MONTH BATTLE OVER THE HYDE AMENDMENT WHICH STALLED THE LABOR-HEW APPROPRIATIONS WILL LIKELY BE REPEATED. AS A RESULT, WOMEN, WHOSE RIGHTS WE HAVE SOUGHT TO PROTECT, WILL SUFFER.

FINALLY, THE MEMBERS OF CONGRESS MUST REALIZE THAT AS A RESULT OF AMENDING H.R. 6075 WITH AN ABORTION PROHIBITION, WE MUST PREPARE OURSELVES FOR A LEGISLATIVE AGENDA WHICH WILL REQUIRE OUR VOTING ON ABORTION AT EVERY TURN. IF THIS LEGISLATION, WHICH CAN BE CONSIDERED **\*\*4765** NOTHING BUT 'PRO-LIFE,' MUST BE AMENDED BY THOSE WHO OPPOSE ABORTION, NO BILL WHICH COMES BEFORE THE HOUSE OF REPRESENTATIVES CAN BE INSURED OF FREEDOM FROM SUCH AN AMENDMENT.

THE CROWNING IRONY IS THAT THE ANTI-ABORTION AMENDMENT NOT ONLY UNDERCUTS THE VERY PURPOSE OF THIS LEGISLATION BUT IT WOULD UNDERCUT AS WELL THE AIM OF THE 'PRO-LIFE' FORCES TO ENCOURAGE WOMEN TO CARRY THEIR PREGNANCIES TO TERM. THE AIM OF THE AMENDMENT'S PROPONENTS HAS TRAGICALLY MISFIRED. THE AMENDMENT IS ANTI-EMPLOYER, ANTI-LABOR, ANTI-WOMAN, AND ANTI-LIFE. IT IS MY SINCERE HOPE THAT IN THE FINAL ANALYSIS, THE ANTI-ABORTION RIDER TO THIS LEGISLATION WILL NOT PREVAIL.

TED WEISS.

1 97 S.CT. 401, 50 L.ED.2D 343.

2 DEPARTMENT OF LABOR ESTIMATE OF THE COST IMPACT OF H.R. 6075, SUBMITTED MAY 31, 1977, TO THE SUBCOMMITTEE ON EMPLOYMENT OPPORTUNITIES.

(Note: 1. PORTIONS OF THE SENATE, HOUSE AND CONFERENCE REPORTS, WHICH ARE DUPLICATIVE OR ARE DEEMED TO BE UNNECESSARY TO THE INTERPRETATION OF THE LAWS, ARE OMITTED. OMITTED MATERIAL IS INDICATED BY FIVE ASTERISKS: *****. 2. TO RETRIEVE REPORTS ON A PUBLIC LAW, RUN A TOPIC FIELD SEARCH USING THE PUBLIC LAW NUMBER, e.g., TO(99-495))

H.R. REP. 95-948, H.R. Rep. No. 948, 95TH Cong., 2ND Sess. 1978, 1978 U.S.C.C.A.N. 4749, 1978 WL 8570 (Leg.Hist.)

**End of Document**  © 2025 Thomson Reuters. No claim to original U.S. Government Works.